WOMEN'S MEDICAL CENTER OF N.W. HOUSTON; Denton Health Services for Women; Austin women's Health Center, P.A.; Robert P. Kaminsky, M.D., and M.D., P.A.; Lamar Robinson, M.D., and M.D., P.A.; Fred W. Hansen M.D., and M.D., P.A.; L.L. Tad Davis, M.D. and Mary E. Smith, M.D., and M.D., P.A. on behalf of themselves and the patients they serve, Plaintiffs,

v.

William R. ARCHER III, Texas Commissioner of Health; John Cornyn, Texas Attorney General; John B. Holmes, Jr., Harris County District Attorney, Bruce Isaacks, Denton Criminal District Attorney; Ken Oden, Travis County Attorney; and Bill Hill, Dallas Criminal District Attorney, in their official capacities, Defendants.

No. Civ.A. H–99–36398.

United States District Court, S.D. Texas, Houston Division.

Dec. 29, 1999.

Craig Smyser, Jr., Smyser Kaplan & Veselka, Houston, TX, Janet Crepps, Simpsonville, SC, for Plaintiffs.

Dona Glimm Hamilton, Office of Attorney General, Austin, TX, Frank Sanders, Harris County Attorney's Office, Houston, TX, Carmen Rivera–Worley, Denton County DA's Office, Denton, TX, David L. Finney, Denton County DA's Office Criminal Division, Denton, TX, Sherine Thomas, Assistant County Attorney, Austin, TX, Elaine A. Casas, Austin, TX, Peter Llewellyn Harlan, District Attorney's Office, Dallas, TX, for Defendants.

## ORDER AND MEMORANDUM

RAINEY, District Judge.

Pending before the Court is the motion for preliminary injunction (Dkt.# 4) filed

by the plaintiffs. Women's Medical Center of N.W. Houston; Denton Health Services for Women; Austin Women's Health Center. P.A.; Robert P. Kaminsky, M.D. and M.D., P.A.; Lamar Robinson, M.D. and M.D., P.A.; Fred W. Hansen M.D. and M.D., P.A.; L.L. Tad Davis, M.D.; and Mary E. Smith, M.D. and M.D., P.A. The plaintiff physicians [1] brought this action "on behalf of themselves and the patients they serve." The defendants are Texas Commissioner of Health William R. Archer. III, and Texas Attorney General John Cornyn.[2]

After reviewing the parties' submitted evidence and briefing, considering the testimony and exhibits received at a preliminary injunction hearing on December 13 and 14, 1999, reviewing the entire record, and analyzing the applicable law, the Court finds that the plaintiffs have met their burden of showing that they are entitled to a preliminary injunction with regard to their equal protection claims and their vagueness claims. Therefore, for the reasons set out in this order, the plaintiffs' motion for preliminary injunction (Dkt.# 4) is GRANTED with regard to the claims that the 1999 amendments violate the plaintiffs' equal protection rights; is GRANTED with regard to the three provisions found to be unconstitutionally vague; but is DENIED with regard to the claims that the 1999 amendments violate the plaintiffs' patients' due process rights.

## I. Introduction

The plaintiffs filed this lawsuit under 42 U.S.C. § 1983 to challenge the constitutionality of the 1999 amendments to Texas' abortion licensing statute and regulations.[3] The regulatory scheme requires that all facilities at which any abortions are performed become licensed and comply with detailed administrative, operating and personnel provisions. Prior to the 1999 amendments that are being challenged in this lawsuit, physicians' offices were exempt from the licensing requirement unless the physician's office was "used primarily for the purpose of performing abortions." *See* TEX. HEALTH & SAFETY CODE § 245.004(2). (Vernon 1992). "Primarily," for purposes of the statute, has been interpreted by the regulations to mean "51 % or more of the patients actually treated within the previous calendar year." 25 TAC § 139.2(21)(B) (1998). The 1999 amendments will significantly narrow the exemption for physicians' offices, by requiring physicians' offices in which 300 or more abortions are performed in any twelve-month period to comply with the licensing scheme. *See* House Bill 2085, Sixty–Seventh Legislature, 1999 Regular Session, 1999 Tex. Sess. Law Serv. Ch. 1411 (H.B.2085) (Vernon's). The plaintiff physicians currently provide a wide range of gynecological services, including abortions, in their private offices. It is undisputed that all of the plaintiffs were exempt from licensing and regulation under the pre–1999 law because abortion constitutes less than 51 percent of their practices. It is also undisputed that all of the plaintiffs currently perform more than 300 abortions per year, and

---

1. Also named as plaintiffs are the professional associations under which the physicians practice.

2. The plaintiffs also sued Harris County District Attorney John B. Holmes, Jr.; Denton County Criminal District Attorney Bruce Isaacks; Travis County Attorney Ken Oden; and Dallas County Criminal District Attorney Bill Hill. However, Holmes, Isaacks. Oden

and Hill were dismissed from the case on December 9, 1999 due to an agreement of the parties.

3. *See* Texas Abortion Facility Reporting and Licensing Act, TEX. HEALTH & SAFETY CODE §§ 245,001 through 245,022; *see also* 25 TAC §§ 139 1 through 139 60.

therefore must become licensed abortion facilities if they wish to continue providing their current levels of abortion services. Previously unlicensed physicians' offices, such as those of the plaintiffs, must become licensed by January 1, 2000. The plaintiffs seek a preliminary injunction against enforcement of the 1999 amendments pending final resolution of their constitutional claims.

## II. The Plaintiffs' Claims

The plaintiffs claim that the 1999 amendments will subject them to onerous administrative requirements that will do nothing to advance the health and safety of their patients. For example, they point out that the regulations require an abortion provider's non-medical office staff, including bookkeepers, receptionists, and insurance verification clerks, to be trained in infection control procedures and numerous other subjects that may be of questionable relevance to their jobs. The plaintiffs contend that the detailed administrative operating and personnel provisions depart from generally accepted medical practice and require a level of formal administration far beyond accepted practice for private physicians' offices. Plaintiffs further contend that requiring written policies to be developed and maintained regarding more than 30 different subject matters, mandating that a "quality control committee" meet quarterly, or requiring that organizational charts be drawn up to show lines of authority, might be appropriate for a large clinic setting where many contract physicians work for a clinic owner who may not be a physician. But some of the requirements border on the absurd, plaintiffs assert, when applied to a private physician's office with four staff members. Some of the plaintiff physicians claim that the costs associated with compliance will require them to increase their fees for abortions. Other plaintiffs testified that they will

cease performing abortions altogether, either due to being financially unable to absorb the anticipated costs of compliance, or due to their fear of incurring civil or criminal liability through arbitrary enforcement or varying interpretations of the statute and regulations. The plaintiffs allege that enforcement of the 1999 amendments will reduce abortion availability and increase costs, which may make these services inaccessible for some Texas women due to prohibitive expense or increased travel. In addition, the plaintiffs feel that the diversion of the physician and staff's time away from patient care, and toward policy-drafting and regulatory compliance, will cause the quality of care to deteriorate. The plaintiffs claim that the 1999 amendments will place an undue burden on Texas women's right to choose abortion and will violate their patients' constitutional guarantees of privacy in reproductive decision making.

The plaintiffs also allege that the 1999 amendments are irrational because they single out physicians who perform abortions in their offices for stringent and burdensome regulations, while physicians performing similar or more risky non-abortion outpatient procedures in their offices are not subject to similar requirements. In addition, the plaintiffs claim that it is irrational to regulate physicians who perform 300 abortions per year in a given location, while leaving unregulated physicians who perform fewer than 300 abortions. Therefore, the plaintiffs claim, the 1999 amendments violate their right to equal protection. Finally, the plaintiffs contend that certain regulatory provisions (which will be applied to them by the 1999 amendments) are unconstitutionally vague.

## III. The Regulations

The following is a summary of some of the regulatory provisions to which the plaintiffs will be subjected on January 1,

2000, barring a preliminary injunction enjoining enforcement:

Licensed abortion facilities are required to provide written notice of the Department of Health's toll-free number to every woman "at the time the woman initially consults the facility." 25 TAC § 139.6. Women calling the number can access information regarding licensed abortion clinics, including status of license, date of last inspection, and any fines or penalties rendered against the facility. 25 TAC § 139.6.[4] Additionally, at the time of "initial onsite consultation," each woman must be provided with a written statement informing her that any complaints about the facility shall be sent to the Health Department. 25 TAC § 139.50.

A written plan of quality assurance implementation must be created and maintained in a licensed abortion facility, and must be reviewed and updated or revised "at least annually." 25 TAC § 139.8 A quality assurance committee comprised of a physician "medical consultant," a registered nurse ("RN") or licensed vocational nurse ("LVN") and "at least two other members of the facility's staff" must be formed and must hold meetings "at least quarterly" and must, at a minimum, evaluate all services related to patient care, ensure review of complications, address issues of unprofessional conduct by any staff member, monitor infection control, address medication, address the integrity of surgical instruments, medical equipment, and patient supplies, and address "the appro-

priateness of diagnosis and treatment." The QA committee must document all remedial action. 25 TAC § 139.8. "Quality" is defined subjectively in the regulations as "the degree to which care meets or exceeds the expectations set by the patient." 25 TAC § 139.2(43).

"An abortion facility shall prominently and conspicuously post the license issued under the Act for display in a public area of the facility that is readily accessible to patients, employees, and visitors." 25 TAC § 139.21(7).[5] Facilities must pay an initial licensing fee of $1,000, a first annual renewal fee of $1,500, then a $2,500 annual fee to maintain the license. 25 TAC § 139.22.

Physicians applying for licenses must provide personal information such as their home address, Social Security number, date of birth, driver's license number, and Texas physician license number. 25 TAC § 139.23.[6] Applicants must also provide information on previous felony arrests or convictions, criminal misdemeanor arrests or convictions, tax liens, and judgments.

A state inspector or "surveyor" may enter the premises of a licensed facility, announced or unannounced, "at reasonable times during business hours and at other times as it considers necessary to ensure compliance." not only with the abortion facility regulations, but with any order of the health commissioner, a court order granting injunctive relief, or "other enforcement actions." 25 TAC § 139.31. In-

---

4. Currently, the plaintiffs, and other exempt physicians' offices, are not listed on any central registry of abortion providers. Once a physician is licensed as an abortion facility, however, any member of the public can verify with a phone call that a particular physician performs abortions. The plaintiffs fear that this will subject them and their patients to being targeted and harassed by anti-abortion activists.

5. The plaintiffs fear that having to post an abortion license in the waiting room will offend their male patients, or their female patients who are there for medical care other than abortion.

6. The plaintiffs fear that putting this personal information in the public record will subject them to harassment and threats.

spection surveys are also performed annually in connection with license renewal. The surveyor is entitled to access all records, and "shall perform an on-site investigation ... to investigate a complaint received by the department." If a surveyor finds a deficiency of any type, the facility owner must submit a written plan for correction of the deficiency within 10 days after being notified of the deficiency, and "the department shall determine if the written plan or correction is acceptable" If the correction plan is not deemed acceptable, the facility owner must submit a revised plan within 10 days.

A license or license renewal may be refused if the facility fails to comply with any provision of the Act, or for numerous other reasons. 25 TAC § 139.32. Administrative penalties up to $1,000 a day may be assessed for any violation. 25 TAC § 139.33. In determining the amount of an administrative penalty, the Health Department may consider all matters "that justice may require." *Id.* Operation of the facility without an appropriate license subjects the physician to criminal liability. *See* TEX. HEALTH & SAFETY CODE § 245.014; 25 TAC § 139.33. The criminal offense was previously a Class C misdemeanor, but the 1999 amendments will increase the offense to a Class A misdemeanor. *See* House Bill 2085, Sixty–Seventh Legislature, 1999 Regular Session, 1999 Tex. Sess. Law Serv. Ch. 1411 (H.B.2085). While the maximum penalty for a Class C misdemeanor is $400, a Class A misdemeanor is punishable by a jail sentence of up to one year and a fine of up to $4,000, or both. *See* TEX. PENAL CODE §§ 12.21; 12.23.

A licensed abortion facility is required to create and maintain written policies and procedures dealing with at least 30 different subject matters. *See* 25 TAC § 139.41. *et seq.* The policies must cover the following areas:

1. administrative policies covering, "at a minimum,"
   A. personnel
   B. employee training, orientation, and evaluation,
   C. employee and patient record system,
   D. auditing system for monitoring state or federal funds,
   E. advertisements,
   F. accuracy of public education materials and activities in relation to abortion, birth control, and sexually transmitted diseases,
   G. patient education/information services and referral services;
   H. reporting requirements;
   I. procedures for the resolution of complaints regarding quality of care. (All complaints must be documented and investigated within 30 days).
2. Clinical policies covering, "at a minimum,"
   A. the provision of medical and clinical services;
   B. the provision of laboratory services;
   C. examination of fetal tissue,
   D. disposition of medical waste,
   E. emergency services,
   F. condition on discharge procedures,
   G. clinical recordings,
   H. reporting and filing requirements
   I. monitoring post-procedure infections
3. A policy to ensure compliance with the Health and Safety Code.
4. A policy to ensure compliance with fire safety codes;
5. Policies on decontamination, disinfection, and sterilization, and storage of sterile supplies.

All of these written policies must be reviewed and revised as necessary, "periodically, but no less than once every two years," and must bear the date of the last review. 25 TAC § 139 41.

Section 139.42 requires a "written organizational structure" identifying the physician, administrator and clinical staff and providing "a description of the structure of an abortion facility and defines the lines of authority." Section 139.43 requires personnel policies, including job descriptions, orientation, training, annual evaluations, continuing education, and basic life support certification. All employees must sign a statement acknowledging patient rights. Section 139.44 requires a "written orientation and training program" that requires all employees, including office staff, to understand and demonstrate competency in about 10 different areas, including patient care, sterilization and infection control, abortion techniques and possible complications of the procedure. All training needs to be documented in each employee's file. Section 139.45 contains specific requirements for the contents of each employee's personnel file, including test results for mycobacterium tuberculosis and hepatitis B. Section 139.46 sets out specific required job qualifications for the office administrator, education and information staff, and laboratory staff, including type of degree, and certain level and type of experience, and requires that the staff include an RN or LVN. Section 139.47 sets out the specific job duties of the office administrator. The administrator must "develop and make available to all staff and the department, a policy and procedure manual including protocols and description of the roles and responsibilities of all personnel." 25 TAC § 139.47(a)(4). Staffing schedules, time-worked schedules, and on-call schedules must be retained for two years, and retained schedules must be stored so they can be retrieved within two hours. 25 TAC § 139.47(c).

Section 139.48 sets out physical and environmental requirements, including a separate recovery room, "a written protocol for emergency evacuation for fire and other disasters tailored to the facility's geographic location," two functioning sinks and a functioning toilet, and the capacity to provide patients with liquids. In general, a facility must "have a safe and sanitary environment, properly constructed, equipped, and maintained to protect the health and safety of patients and staff at all times." 25 TAC § 139.48(1)(A).

The facility must develop and maintain written infection control standards which "shall include, but not be limited to HIV, hepatitis B and C, tuberculosis and streptococcus." 25 TAC § 139 49. There also must be written policies on "educational course requirements" and "decontamination, disinfection, sterilization and storage of sterile supplies." These written policies must include provisions regarding "the receiving, cleaning, decontaminating, disinfecting, preparing and sterilization of critical items" and "assembly, wrapping, storage, distribution, and quality control of sterile items and equipment." Section 139.49 also requires written policies and procedures on cleaning procedure rooms, and a written policy on the "handling, processing, storing and transporting of clean and dirty laundry" Several pages of specific detailed sterilization instructions set out in the regulations are required to be included in the written policies. Each sterilizer must be monitored during operation for pressure, temperature, and time at desired temperature and pressure, and a record kept of all these items. Performance records for all sterilizers shall be maintained for at least two years. A preventative maintenance record for each sterilizer must be maintained for at least

two years, and stored records must be available within two hours. 25 TAC § 139.49.

The licensee shall "ensure that all patients . . . are cared for in a manner and in an environment that enhances each patient's dignity and respect in full recognition of her individuality." and shall ensure that all patients "receive care in a manner that maintains and enhances her self-esteem and self-worth." 25 TAC § 139.51.

Section 139.53 requires that a physician, physician extender, registered nurse or licensed vocational nurse "must be in the facility whenever there is a patient in the procedure room or recovery room." A patient may not be left unattended in the procedure or recovery room. The recovery room must be supervised by a physician, physician extender, or registered nurse. Section 139.55 provides that the daily patient roster records must be maintained for 5 years, and requires a written policy and procedures regarding the removal of records and the release of information. The facility "shall establish and maintain a clinical record for each patient . . . to assure that the care and services provided to each patient is [sic] completely and accurately documented, readily, and systematically organized to facilitate the compilation and retrieval of information." Section 139.55(c) contains detailed instructions on how to create and maintain a patient's file, including a specific list of what information and documents must be in each file. Patient records must be retained "in their original state" and "correction fluid or tape shall not be used in the record. Corrections shall be made by striking through the error with a single line and shall include the date the correction was made and the initials of the person making the correction." Clinical records for adults must be maintained for 5 years; records for minors must be maintained for 5 years after the patient reaches majority. Retained patient records must be retrievable within 2 hours. The facility must create and maintain "a readily accessible written protocol for managing medical emergencies." 25 TAC § 139.56. Physicians must have admitting privileges at a local hospital, or have "a working arrangement" with a physician who has admitting privileges. The facility "must have the necessary equipment and personnel for cardiopulmonary resuscitation." 25 TAC § 139.56(b).

Section 139.57 requires "written discharge instructions" including a list of specific information that must be included. Written policies are required regarding examination and referral of all patients who report complications. (Complaints and responses must be documented in the patient's record under "a written system of documentation"). A written policy must be developed regarding the review of the record-keeping system for complications.

Section 139.59 contains definitions of different levels of anesthesia, and sets out required procedures, equipment and standards for procedure rooms relating to anesthesia services.

Section 139.60 requires that the facility must be in compliance with other laws and regulations, including all state and federal laws on handling drugs, the Clinical Laboratory Improvement Amendments, the Certification of Laboratories Act, the Texas Medical Practice Act, the Physician Assistant Licensing Act, the Nursing Practice Act, the Board of Vocational Nurse Examiners rules, the Texas Pharmacy Act, the Health and Safety Code provisions on misbranded drugs, the Texas Deceptive Trade Practices–Consumer Protection Act, federal OSHA requirements, and federal regulations regarding fire prevention, emergency plans, personal protective equipment, eye protection and hand pro-

tection, fire extinguishers, food-borne pathogens, and hazardous use of chemicals.

## IV. Findings of Fact [7]

In 1997, more than 84,000 abortions were performed in Texas. Under current law, Texas has 31 licensed abortion facilities. The abortion statistics that all physicians are required to report annually show there are 7 physicians who currently perform more than 10 abortions per year, but fewer than 300 abortions, so they are currently exempt from abortion facility licensing and will remain exempt under the 1999 amendments. A handful of physicians, "a single-digit number," perform fewer than 10 abortions a year.[8] The challenged 1999 amendments will bring within the regulation only physicians who perform more than 300 abortions a year in their private offices, but whose abortion patients constitute less than 51 percent of their total private practice patients. The evidence before the Court indicates that there are 12 physicians in Texas (approximately 20 percent of the state's abortion providers) who meet this definition and who therefore will become subject to the abortion facility licensing and regulatory requirements as of January 1, 2000. Five of the 12 physicians affected by the challenged provisions are plaintiffs in this case.

Plaintiff Dr. Fred Hansen is a board certified physician with more than 30 years of OB/GYN practice. He owns a private gynecology practice in Austin under the professional association name Fred W. Hansen. M.D., P.A. Hansen provides comprehensive gynecological care to his patients, including annual exams and pap smears, treatment of female reproductive system problems, family planning, and infertility counseling. He also performs approximately 950 to 1,050 abortions a year. His office staff consists of a medical assistant, a receptionist, an office manager, and a part-time transcriptionist. Hansen said abortion is simply one procedure among many that he provides to his patients. He does not advertise that he provides abortion; almost all of his abortion patients are referred to him by other physicians. He also receives referrals of active military personnel and dependents from many areas who cannot get an abortion for any reason at a military hospital, and many of his patients come regionally from the areas surrounding Austin.

In addition to his private practice, Hansen has served for 16 years as a medical director to Reproductive Health Services, an Austin abortion facility that has been licensed under Texas law since licensing of abortion clinics was first required in 1985.

Many of the abortions Hansen provides in his private practice are for what he calls "obstetrical tragedies" that occur in wanted pregnancies, such as the discovery of a profound fetal abnormality in the skull, heart, or other vital organs, or the diagnosis of a chromosomal defect. These "medically indicated" abortions typically occur past the 15th week of pregnancy, when perinatal tests reveal the problems with the pregnancy. Hansen testified that he is currently the only private physician in Austin who provides abortions beyond the 15th week of pregnancy, so if Hansen were to close his private abortion practice, couples in the Austin area who are facing the tragic choice of whether to abort a pregnancy when defects are discovered would have to go to an abortion clinic rather than a private office. This, Hansen says, would

---

7. To the extent that any conclusion of law is more properly characterized as a finding of fact, and vice versa, the Court adopts it as such.

8. Some abortions occur in hospitals, which are also exempt from abortion facility licensing

greatly reduce the emotional support and counseling such patients would receive. The private setting also offers an element of privacy lacking at a clinic, where virtually all of the patients there have come for an abortion. Currently, a woman in Hansen's waiting room could be there for birth control pills, an annual exam, or another gynecological procedure, not just an abortion. Hansen's office is not listed on any public registry of abortion providers, and he has been picketed rarely, only three times in the last 12 years. In contrast, he said, a clinic might see up to 35 patients a day, and clinic patients are subjected daily to confrontational anti-abortion picketers. Women seeking abortions at a clinic often must wait five to nine hours at the facility, and Hansen believes that their already fragile emotional state will deteriorate in this setting. In addition, staff turnover at clinics tends to be higher, so personnel are likely to be less experienced and sensitive to patients' needs.

Hansen testified that he, and other gynecologists, perform gynecological procedures in their offices other than abortion,

Abortion does not require a different, or more stringent, type of sterilization of instruments than other gynecological procedures Hansen performs in his office, such as endometrial biopsies, cervical biopsies, dilation and curettage ("D & C"), and the removal of a fetus that has died in utero. These procedures carry risks similar to those of abortion,[9] and it would not be unusual for a gynecologist to perform a combined 300 or more of these procedures in a year. Hansen also testified that other outpatient surgical procedures are also routinely performed in physicians' offices, such as liposuction, which can involve more

risks than abortion. Yet only abortion subjects a physician to regulation. Hansen knows of no other outpatient procedure that is regulated based on the number of procedures performed in a year. He testified that there is no medical or logical reason to distinguish between a physician who performs 300 abortions a year from one who performs 299 abortions a year, or from one who performs 300 similar gynecological procedures.

In his practice, Hansen testified, he has trained all of his employees in sterilization procedures, with the assistance of the manual for the sterilizer. He does not have written infection control and sterilization policies, because he and his seasoned staff already know the procedure. He is always there when the office is open, so he is there to see that sterilization is done properly, although due to the long tenure of his staff, it is "extremely rare" that he sees a sterilization problem that needs correcting. "My infection rate is almost non-existent," he testified. He admitted, however, that he had not calculated or come up with any hard estimate on how long it would take him to draft infection control or sterilization policies. He does not believe he could copy them from the licensed facility where he works because they are proprietary materials. He admitted that he has not looked to see whether some of the regulations duplicate requirements in statutes to which he is already subject, such as the Clinical Laboratory Improvement Amendments, OSHA, or the Texas Medical Practices Act.

If Hansen were to become licensed, he would have to immediately hire an RN or LVN, because the regulations require that

9. In fact, Harris testified that the removal of a fetus following demise—which is specifically excluded from the definition of abortion under 25 TAC § 139.2(1) and so would not subject a physician to regulation—is actually more dangerous to the patient than the abortion of a living fetus.

an RN or LVN be on staff.[10] He testified that because he and his staff are all fully occupied by their current workload, (and because he does not believe that any of his current staff members have the required expertise to track compliance of these detailed regulations), he estimates that he would have to add an additional person to ensure compliance. Another option would be to replace his office manager and transcriptionist, who have worked for him for 14 and 22 years, respectively, and replace them with the RN and a staff person who would serve as the administrator in charge of regulation compliance. However, he does not believe an RN or LVN is necessary to provide good medical care to his patients. He does not currently have formal written personnel policies for his four employees, and he has no written organizational chart showing delegation of authority.

Hansen also expressed concern with the requirement that he post or provide each patient with notice of the toll-free number to the abortion licensing division where "all complaints" must be directed. "I run an integrated medical practice, and I just don't know how my 71–year–old patients are going to react [to a document telling them] that if they're dissatisfied that they're to call the abortion licensing division of the Texas Department of Health. It's a demeaning requirement to ordinary patients." Having to provide personal identifying information with the license application bothers him, because of recent incidents around the country where abortion practitioners were killed. He fears being more vulnerable to violent activists who might target him for harassment or violence.

Hansen estimates that if he were to become licensed and comply with the regulations, he would incur about $60,000 in additional costs annually for the two new staff members. Since he does about 1,000 abortions a year, the extra staff expense alone would equal a cost of $60 per procedure, although he testified that he would not necessarily raise the price to his patients.

In general, Hansen agreed that the requirement that freestanding abortion clinics be licensed and regulated by the state has done some good in deterring "individuals who would establish corner clinics, multistate clinics, and be interested only in it for a remunerative basis." When non-physicians own abortion clinics, Hansen said, he sees the possibility that quality medical care may be sacrificed to the "bottom line." He acknowledged that if a private physician is doing 2,000 abortions a year, then "a more formal process might be perhaps advantageous." But he does not believe that becoming licensed at his own private office would improve patient care.

Hansen testified that he will stop providing abortions in his private office rather than seek to be licensed, because he believes patient care would suffer while he and his staff spend time on burdensome administrative tasks, and because he does not want to be subjected to possible fines and criminal penalties. He will continue to serve as medical director to Reproductive Health Services and will continue to perform abortions at that facility.

Plaintiff Dr. Mary Smith operates a private gynecology practice in Denton, Texas, under the professional corporation name Mary E. Smith, M.D., P.A., She does business as "Denton Health Services for Women." ("DHS"), which she opened 22 years ago. At DHS she provides her patients with gynecological examinations, early pregnancy tests, sonograms, emergency

---

10. *See* 25 TAC §§ 139.46(3)(B); 139.8; 139.53.

contraception, family planning services, and testing and treatment for sexually transmitted diseases. She provides abortion services two mornings a week at DHS. Smith testified that she does much of the practice management herself. She has one full-time employee, a counselor who also answers the phone, and she employs a part-time receptionist, and an RN and an LVN who alternate coming in on days when she does surgery. She currently provides about 350 to 400 abortions a year at DHS. She testified that she feels comfortable with keeping the number of abortions she provides at around 400, because at that level she can remember each patient's name and personally supervise their care. "That's enough for me to keep in my head and know at home when they call me," she testified.

Smith also performs abortions two and a half days a week at the Fairmont Center, a licensed abortion clinic in Dallas. The Fairmont clinic is about 45 minutes to 90 minutes away from DHS by car, and she is not aware of any public transportation available between Dallas and Denton. She performs about 2,000 abortions a year at the Fairmont clinic. Occasionally she treats patients from Denton at the Dallas clinic. She testified that her experience with health department surveyors at the Fairmont clinic has been negative. However, she admitted that the regulations have the potential to improve health care in some physicians' offices, whether they perform abortion or other surgical procedures.

Smith testified that she is the only Texas abortion provider north of Dallas. Many of her patients are from Denton, a university town, but some come from throughout Denton County and north of Denton all the way to Oklahoma. Some patients drive in from other cities to come to her because they prefer a female doctor.

"To my knowledge, I am the only female physician providing abortions in Texas," Smith testified. Many of her Denton patients have difficulty paying for an abortion and often have to delay the procedure in order to come up with the money. A lot of the patients arrive by taxi or trolley and have no transportation back home, so Smith or her staff have to drive "quite a few" of their patients home after the procedure.

Smith and her nurses are responsible for sterilization of instruments, and Smith supervises the sterilization to be sure it is done properly. The counselor and receptionist do not have any training in sterilization. She testified that if she were to become licensed, she would have to purchase a new autoclave to meet the requirements of 25 TAC § 139.49, which requires sterilizers to be "monitored during operation" and requires recording and keeping records on the pressure, temperature, and time maintained at desired temperature and pressure. Because her "ancient" autoclave does not electronically record this data, she would either have to buy a new one or have someone sit in the room with the autoclave during the time when it is running to record all the required information. She would have to purchase an oral suction machine apparatus, which is required under 25 TAC § 139.59(f)(4) in facilities which use light sedation. She currently does not have any of the required written policies required by the regulations, and she sees no need to, for example, draft a written "advertising" policy regarding her one listing in the phone book, or to draft a written policy regarding the accuracy of public health information that she herself provides to her patients. She has no written complaint policy, but she personally deals with any complaints that come in. She has no written policy regarding the monitoring of post-procedure infections, but her patients can and

do call her directly with any concerns about infection. "It's worked for me for 22 years," she testified. "I'm having a hard time understanding why I need to change." She believes that none of the regulations would improve patient care in her practice, because she would be distracted by having to meet all the requirements, which would take time and attention away from patient care. The required quality control committee composed of at least four staff members could not be assembled without requiring one or more of her part-time employees to take off from their other job to come in, because her four staff members are very rarely in the office at the same time. It would be very difficult to schedule such meetings during regular working time, because she and her staff already are fully occupied on the days the office is open and providing abortions.

Smith does not plan to become licensed. She testified that her practice in Denton is already struggling financially, and has only been continued due to her feelings of loyalty and commitment to the community of Denton. However, the increase in expenses due to the licensing fees, purchase of required equipment, and compliance with the regulations would make it financially impossible to continue. She would have to either hire someone to draft all the required policies, or find the time to draft them herself, because no one else on her staff would be capable of doing it. She has talked to the person who drafted the policies for the Fairmont Center in Dallas, and found out that drafting those policies took three months. She doesn't believe that the Fairmont policies could be used as a model for policies for DHS, because the procedures at a clinic of 20 employees are necessarily different from a private practice with four employees. Section 139.53 requires the recovery room to be supervised by a physician, physician extender or RN, and Smith testified that she needs her

nurse to assist her with surgery, so she probably would have to hire another nurse to supervise the recovery room. She admitted, however, that she has not put pencil to paper to calculate exactly what all the costs of compliance would be.

Because 80 percent of her income is from providing abortions both at DHS and at the Fairmont Center in Dallas, ceasing to provide abortions in Denton would mean that she would have to shut down her entire private practice in Denton. As a result, her patients in Denton would lose the personalized care she has been able to give them, and some may be prohibited from obtaining abortions due to lack of money and transportation. "Some of them will make it to Dallas," she testified. "The ones who can't will go on and have babies."

Plaintiff Dr. Tad Davis is a board certified OB/GYN who conducts a private gynecology practice in Austin, Texas under the professional name Austin Women's Health Center, P.A. ("AWHC"). Davis has approximately 15 part-time and full-time employees, including three front-desk employees who do insurance verification, receptionist work and other clerical tasks, two certified counselors, four medical assistants, three LVN's, a bookkeeper, a personnel director and another physician. AWHC provides comprehensive gynecological care, including routine examinations, family planning, and diagnosis and treatment of diseases affecting the reproductive system. he also provides abortions up to 15 and a half weeks of pregnancy. His patients come regionally from the area surrounding Austin, including areas southwest to San Antonio, northeast to Waco, south to Interstate 10, and northwest to Killeen and Copperas Cove and up into the Texas panhandle, including Lubbock, Midland, and Odessa. He estimates that about 25 percent of his patients fall below the federal poverty level. Davis testified

that his patients benefit greatly by the private atmosphere of a practice that provides a wide range of other medical care besides abortion, and by having the accountability of one physician who is responsible for the entire practice. "Unfortunately in clinics sometimes there is the cattle herd mentality where a number of patients are brought in, sent through procedures, and tender love and care is not given to them as much as in the private office," Davis testified.

Davis testified that having to comply with the regulations will jeopardize confidentiality, increase costs, and cause a great deal of dissatisfaction among his staff. He estimated that the additional costs of compliance will require him to raise his abortion fees by $25 to $50 per procedure. That estimate does not include the one-time cost of a consultant he intends to hire to come in and draft his policies and help him come into compliance. "The regs are very difficult in the fact that they're open to interpretation," Davis testified. "They're very difficult in the fact that it requires pounds and pounds and pages and pages of paperwork, and things that physicians' offices are just not attuned to, so one has to have a consultant in order to proceed, if they're going to get licensing." He testified that his consultant estimates that it will take three weeks, at $1,000 a day, to get all of the required policies written. In addition, the consultant estimated that he would have to close the office down for one week to train all of his employees. The cost of paying the consultant for three weeks, and the cost of closing down the office for a week to train his employees, would mean $50,000 to $60,000 in start-up costs, he testified. He admitted on cross-examination, however, that he has not attempted to locate a less expensive consultant, and he admitted that he did not provide his consultant with a copy of all the regulations to review

before coming up with her cost estimate; he merely read some of the regulations to her over the phone. He also did not tell the consultant that the pre-licensing procedure includes a visit from a health department surveyor for the purpose of explaining and interpreting the regulations and helping the office become compliant. He testified, however, that he does not believe the health department will be of much help to him in interpreting the regulations, based on a phone call he made to the health department seeking to understand certain parts of the regulations. He states that the person he spoke to did not answer his specific questions, but merely read the regulation to him. He admitted, however, that he does not know who he spoke to and whether that person was an experienced surveyor. Davis admitted that he has not compared the various written manuals he currently has in his office with the regulations to see whether he already has on hand some of the required written policies. He testified that he would not have to add any more employees to comply with the regulations.

Davis does not believe that any medical benefit would be gained by having to train his front office employees—whose sole duties are to verify insurance, perform receptionist duties, and schedule appointments—in areas such as infection control and sterilization. He believes his practices are already effective to prevent infections. "Our complication rate has been one of the lowest in the world," he testified. In addition, he estimates that training the front desk employees and the bookkeeper, who do not have any medical education, will take longer than training a medical assistant or other person who has health care background or credentials. In addition some of his employees are part-time, so it may be difficult to schedule a time for them all to come in to be trained.

Currently, AWHC charges $350 to $550 for an abortion. Davis testified that all of the costs of compliance will be passed on to his abortion patients, many of whom "barely can come up with the funds now, and this will put them over the edge where they will not be able to have abortions." This increase of $25 to $50 (or more, depending on the period over which the start-up costs are recovered) per procedure will be on top of other expenses many of the abortion patients are already having to pay, such as medications, and the cost of travel and overnight accommodations for those patients who travel for long distances to come to his office. He testified that these estimates contemplate passing the increased costs along only to his abortion patients, not to his practice as a whole, and he admitted that he has not determined how long of a period he would use to defray the start-up costs.

Davis also performs other gynecological procedures in his office that carry risks similar or identical to abortion, such as D & Cs, endometrial biopsies, hysteroscopies, and conization. He testified that a D & C is virtually the same procedure as an abortion, and a conization, in which a portion of the cervix is surgically excised for the diagnosis and treatment of pre-cancerous tissue, is more complicated and involves more risks than abortion. Yet only abortions will subject him to regulation. In addition, he testified that almost all physicians do some sort of invasive procedures in their offices, some of which carry a higher risk to the patient than abortion. He testified that tummy-tucks, facelifts, liposuction, endoscopy, and laparoscopy are commonly performed in physicians offices, but do not subject physicians to regulation. Laparoscopy, for example—which has been approved by a reputable medical organization as being appropriately performed in a physician's office—carries a risk 10 times higher than that of abortion.

Davis sees no medical reason to regulate these other office surgical procedures differently from abortion. He also sees no reason to regulate a physician who performs 300 abortions a year in his office, but leave unregulated a physician who performs 299 abortions. On the contrary, in his experience a physician who does a greater number of procedures tends to be more competent than an occasional practitioner. He testified that the amount of time a doctor has to spend with each patient is not necessarily related simply to the number of abortions the doctor performs; rather, it depends on a number of factors, including the length of office hours, the availability of other medical support staff, and the number of total patients seen or non-abortion procedures performed.

Davis has for about 10 years participated in the review and discipline process of the Texas Board of Medical Examiners, and he testified that the TBME has done an excellent job for at least the last 10 or 12 years in monitoring physicians and disciplining physicians who provide substandard medical care. In addition, he testified that under the "captain of the ship" doctrine, the TBME holds the physician personally responsible for any substandard care provided by his staff. He testified that the possibility of a complaint to the TBME or a malpractice lawsuit causes him to be vigilant in maintaining the proper standard of care for his patients. He admitted, however, that the TBME does not promulgate regulations or regularly inspect physicians' offices, but reacts only to complaints about a physician from patients, hospitals or other practitioners.

Davis testified that an abortion is one of the most traumatic events in a woman's life, and although his office tries to provide comfort, counseling, and "TLC" to maintain the patient's self esteem and self-

worth, he's not sure that it is possible for an abortion to "enhance" a patient's self worth, as required by 25 TAC § 139.49. In fact, Davis believes that the time that will be required to reach and maintain compliance with the regulations will actually decrease the time he and his staff have available to provide personalized care, which could make the experience worse for many of his patients. Davis plans to seek to become licensed, but he has doubts about how long he will continue providing abortions, or whether in the future he will try to limit his abortions to fewer than 300 a year.

Plaintiff Dr. Robert Kaminsky is a Houston gynecologist who owns a private practice under the professional corporation Robert P. Kaminsky, M.D., P.A., doing business as Women's Medical Center of Northwest Houston. Kaminsky has one other physician who works with him at the Women's Medical Center, and he also employs a nurse practitioner, a part-time licensed vocational nurse ("LVN"), three full-time medical assistants, two receptionists, two office employees who deal with insurance verification, an accountant-bookkeeper, and an administrator. The office provides comprehensive gynecological care, including diagnosis and treatment of menstrual disorders and sexual dysfunction, contraceptive planning, infertility evaluation, gynecological surgery and abortions. Kaminsky estimates that he personally performed 700 to 750 abortions during the last year, which is half of the abortions done in his office. He testified that he spends about half of his time doing abortions, and about two-thirds of his income in 1998 came from abortions.

In his medical opinion, abortion is no more complicated and entails no greater risk than many gynecological surgeries that he routinely performs in his office. Kaminsky also performs pap smears, IUD insertions, D & C's, and cervical and endometrial biopsies. Endometrial biopsy, a procedure to sample and remove a tissue specimen from the inside of the uterus, is virtually identical to a first-trimester abortion in technique and technical difficulty, as well as in the instruments and medication used.

He testified that he has developed infection and sterilization procedures that have proven extremely effective for all the surgical procedures he performs, although they may not meet all the particulars of the regulatory scheme. He uses the same sterilization procedures for abortions as for other procedures, and he testified that there is nothing about the abortion procedure itself that would require a different protocol. "There is no basis for the state to single out abortion procedures and dictate the sterilization and infection procedures," Kaminsky states. "Nor can I understand, from a medical perspective, why a distinction is made between physicians performing less than 300 abortions and those performing more than 300 in a twelve-month period." He testified that a medical assistant who has worked for him for 10 years instructs other medical assistants on how to sterilize instruments He has no written sterilization policy other than manuals for the equipment. He has no written infection control policy, and states that his office has not had a problem with infection. He does have a personnel policy, a checklist of items to cover in the orientation of new medical assistants, and some other instructional documents.

Kaminsky does not have a formal quality assurance program, but he monitors the provision of medical services on an ongoing basis, dealing with problems as they arise and during staff meetings if necessary. "This system, while informal, has proven efficient and effective," he states. "The quality assurance provisions in the regula-

tory scheme may be appropriate for an ambulatory surgery center setting because different physicians use the facility and patients will most often receive follow-up care in the private office of their referring physician. In my private office practice, where I am ultimately responsible for all of the medical care, I do not believe that this type of quality assurance program is necessary to ensure patient health and safety. Compliance, would, however, require additional staff time."

Kaminsky estimates that he spent approximately 45 minutes reviewing the challenged regulations, but that he has not asked his staff to review them, and he has not considered whether the regulations would require any physical changes to his facility. He admitted that he has not done a general cost estimate on how much it would cost him to comply with the regulations. He believes most of the additional costs will come from the additional staff time needed to develop the required written policies and to document compliance. He believes that having to comply with the regulations will likely result in an increase in abortion fees, which will force women to pay more for the procedure or go elsewhere.

Plaintiff Dr. Lamar Robinson provides a wide range of obstetrics and gynecology services, as well as other general practice medical care, in his private office in Dallas. He performs abortions at his private office, and he also performs abortions at a licensed abortion facility, the Aaron's Women's Health Center in Dallas, for four half-days a week. Robinson testified that 2,211 abortions were performed at his private office during 1998, and he estimates that the 1999 total would be similar. He estimates that 40 or 50 percent of his income comes from abortions. He has 14 employees at his private office, and he has two other physicians who help him on a part-time basis. His employees include an office administrator, an office manager, a lab manager, a business manager, nurse practitioners, nurse staff, a registered nurse, several medical assistants, a designated cashier, and one designated receptionist.

Robinson has submitted a preliminary application and has paid an initial licensing fee to become licensed under the Abortion Facility Reporting and Licensing Act, and has participated in an initial telephone survey with the health department. He and his staff have compiled a list of anticipated costs associated with becoming licensed. He estimates that he will have additional payroll expenses for additional staff hours spent writing policies, generating new forms, and revising old forms. Robinson testified that he currently has written infection control procedures, written personnel policies and training materials. He anticipates having to make changes in his sterilization area, and expects to incur ongoing additional costs of about $5 a patient to meet the requirement that new suction tubing be used for every procedure. Robinson currently charges $250 for a first-trimester abortion in his private office. Overall, Robinson expects to incur costs associated with becoming licensed that will total as high as $100 per patient.

Robinson objected to the requirement that the abortion facility license be "prominently displayed for everybody who comes in the door." *See* 25 TAC § 139.21(7) ("An abortion facility shall prominently and conspicuously post the license issued under the Act for display in a public area of the facility that is readily accessible to patients, employees and visitors."). Robinson expects his practice to suffer due to the posting requirement, because the posted abortion license is likely to offend his obstetrical patients and male patients, some of whom oppose abortion.

Robinson sees no medical reason to single out abortion for this type of regulation. He states that he also performs diagnostic hysteroscopy and D & C procedures in his office, and that these procedures involve virtually the same instrumentation, sedation, techniques, duration, and risks as a first-trimester abortion. Yet only the abortions will subject him to regulation. The burdens of the regulatory scheme, according to Robinson, come from requiring an office which has operated informally, as most private offices do, to follow requirements more appropriate for a facility like an ambulatory surgery center. "I do not think these written policies are necessary to improve or ensure patient safety," Robinson testified. "Compliance with the provisions of the regulations would be driven by the threat of civil and administrative penalties and a loss of license rather than a perception that they will enhance the well-being of my patients."

The defendants introduced the deposition testimony of Dr. Janet Lawson, a board certified OB/GYN who is currently employed by the Texas Department of Health as the medical consultant for women's health. Lawson was formerly in private practice, and she has performed abortions in the past. Lawson testified that she participated in a committee in 1997 to revise the abortion facility regulations. The revisions that she helped draft became effective on August 13, 1998, and were applicable at that time to abortion clinics and physicians' offices used primarily for the purpose of performing abortions. Lawson was not involved in drafting the 1999 amendments that are being challenged in the instant case, so she did not participate in choosing the number 300 as a cut-off for the physicians' office exemption.

During the 1997 committee process to draft the 1998 revisions to the abortion regulations, Lawson was a consultant to the sterilization committee and a member of the quality of care subcommittee. The overall ad hoc committee included physicians, nurses, pro-life activists, pro-choice activists, health department personnel, a director of a licensed abortion facility, and a physician specializing in epidemiology and infectious diseases. Lawson helped draft the part of the regulation requiring a quality control committee because "having quality assurance in any practice is important." She testified that when she was in private practice, she had policies in place to deal with patient care, triage, the handling of complaints, and other areas.

Lawson said that one of the 1997 committee's goals was to avoid decreasing access to abortion or unnecessarily increase costs to abortion facilities. She does not specifically recall talking about the cost implications for individual physicians' offices. The patients' rights section was drafted to make sure each woman was taken care of in a dignified way respectful of her individuality, "much as you would in the practice of medicine as a physician anyway." As a physician, she does not consider the patients' rights language to be vague.

Lawson testified that a woman's right to quality care and right to regulatory protection are the same whether she is going in for an abortion or for any other procedure. She is of the opinion that Texas should have regulations similar to the abortion facility regulations in place for other medical procedures as well, regulations that take into account the actual risks for each individual procedure. She testified that she has performed D & C procedures, and that, depending on why the D & C is being done, a D & C might present more or less risk than an abortion.

She was not involved in choosing the 300–abortion cutoff for the 1999 amendments, so she doesn't know how or why that number was chosen, but she does believe that, "[a]s you increase the number of abortions, or procedures that are done of any type," the physician tends to have less time to attend to issues like sterilization, counseling, and triage, and more of those duties are left to the physician's staff. Therefore, Lawson reasoned, it makes sense to require that the staff receive specific training to be able to handle problems or complications when the physician is not immediately available. "As the distance between the physician and the patient gets wider, it's harder for the physician to take care of [the patients'] needs, unless there's some specific policies, guidelines, processes, that are in place."

The defendants also presented the testimony of Dr. Kate Hendricks, a physician specializing in infectious diseases and epidemiology who currently is employed by the health department. Epidemiology is the study of how disease is distributed in a population, how disease spreads, and how that spreading can be prevented. Hendricks was involved in the 1997 committee that drafted the 1998 revisions to the abortion regulations. However, she testified that she was not involved at all in the passage of the 1999 amendments, and was not consulted regarding the narrowing of the physicians' office exemption to include all offices where 300 or more abortions are performed in a year.

During the 1997 revisions to the regulations, Hendricks was specifically involved in the subcommittee on sterilization regulations. She helped to select other resources the regulation drafters used, such as documents from the "hospital infection control" section of the Centers for Disease Control and Prevention.

She remembers that the applicability of the regulations to physicians' offices was discussed "some," but not extensively. Because the regulations at that time only applied to physicians' offices used primarily for abortions, the drafters had in mind only those "51 percent or more" physicians' offices, she said. Hendricks testified that regardless of where a woman goes to have a procedure done, whether in an operating room, at a clinic, or in a physician's office, she should have the same protection from infections.

Hendricks testified that infection control standards and sterilization are important in the abortion context because the procedure invades the uterus, which is normally a sterile body cavity. She said that staff training is important in these areas, because some of the dangers of contamination are not obvious; for example, a staff member might accidentally cross-contaminate sterilized instruments if he or she has not been taught how to handle them properly. She also testified, however, the sterilization and infection control requirements that she helped to draft are equally applicable to all invasive surgical procedures performed in a physician's office. She states that the American College of Obstetrics and Gynecologists ("ACOG") would agree that such requirements are equally appropriate for abortion and all gynecological surgery.

During the 1997 committee discussions, the members did not discuss how much time it would take for physicians' offices to draft all of the required policies, but Lawson pointed out that there exist resources of medical information that can be used in drafting policies, so that physicians don't have to "do it from scratch."

Hendricks was asked to be a witness in a lawsuit where a woman died from a severe infection following an abortion, and she was notified by a hospital about anoth-

er death following an abortion. She testified that those incidents occurred before 1997, in an abortion facility that was already licensed by the state. She has never been notified about, or attempted to track, any infections or deaths following other gynecological surgery in Texas. She has worked at the health department for 10 years, and often gets calls about incidents or outbreaks of disease in various health care areas, but she has never been notified of any particular problems with infection following gynecology surgery or other outpatient surgeries performed in physicians' offices.

Hendricks testified that a first trimester abortion procedure is "quite similar" to a D & C procedure, in terms of both required instruments and level of invasiveness. She testified that there are no medical, health or safety reasons to distinguish a private physician's office where 300 abortions a year are performed, from a physician's office where 300 D & C's are performed, or from a physician's office where less than 300 abortions are performed. "I think [that] based on ACOG standards, they should be the same," she testified. "To protect the woman, they should have the same standards."

The defendants also introduced the testimony of Mark Jeffers, a registered nurse now employed by the health department. In 1997, he was in charge of organizing and guiding the task force members who were working to revise the abortion regulations. He stated that he tried to keep the committee focused on the goal of improving women's health. He discussed the various subcommittees that worked on different parts of the revisions, such as sterilization, quality of care, and qualifications of personnel. He helped to draft the quality control regulations, and he testified that quality assurance in a medical facility is important "no matter what kind of service they provide." He testified that the regulations require an LVN or RN to be on the quality control committee because "they are needed for their expertise."

Jeffers testified that the 1997 committee was focused only on the facilities covered by the statute at the time. Those physician offices affected by the 1999 amendments—those who perform more than 300 abortions a year, but whose practice does not consist "primarily" of abortions—were not contemplated at the time the committee was drafting the regulations that became effective in August 1998, Jeffers said.

Jeffers admitted that there is no objective way to measure compliance with the "patient rights" regulation that requires physicians to "enhance" each patient's dignity and self-esteem. He agreed that people might have different interpretations of that language, and that a health department surveyor might have a different interpretation than a physician regarding whether the physician was in compliance. Jeffers acknowledged that it would be up to the surveyor's discretion and interpretation as to whether the physician would be subjected to civil or criminal penalties for not doing enough to "enhance ... self esteem." *See* 25 TAC § 139 51.

The defendants also introduced the deposition testimony of Julie Long, a registered nurse employed by the health facility licensing and compliance division of the Texas Department of Health. She has a master's degree in health care administration, and she has an obstetrical background. As an RN, she has assisted in abortion procedures. From 1990 to 1995, Long worked for the health department as an obstetrical nurse consultant. Her main job responsibility was scheduling and conducting surveys of licensed abortion facilities and licensed birthing centers. In fact, during part of this time she was the only surveyor in Texas, so she did virtually all

of the surveys of licensed facilities. The regulations Long worked under were a different set of regulations than the ones now codified at Tex. Health & Safety Code §§ 245.001 *et seq* and 25 TAC §§ 139.1 *et seq.* "They were completely revised in August of 1998." Long testified. From 1990 to 1995, Long did annual surveys, conducted pre-survey conferences with facilities, investigated complaints, and reviewed the facilities' correction plans. She took phone calls from members of the public who had questions about particular facilities, and from facility owners who had questions about the licensing regulations and the survey process. She also prepared a surveyor training manual for abortion facility surveys and trained other surveyors in the process. She also conducted investigations and surveys of other health care facilities other than abortion facilities.

A typical survey of an abortion facility during Long's tenure as a surveyor from 1990 to 1995 included a pre-survey conference with the physician or administrator, observation of an abortion procedure, listening to a counseling session, inspecting the laboratory, observing the staff members performing their various functions, and observing the sterilization of instruments and the examination of fetal tissue. She would also review personnel records, review policies and procedures, and randomly pull and review a sample of patient medical files from the last six months. In a facility that provides services other than abortion, she would identify and review only those personnel and patient records having to do with abortion. All information from the records is kept confidential.

During this period, Long paid special attention to the sterilization process, observing the employees as they worked on the sterilization of instruments, and interviewing them about their procedures. "And in many instances I found that there were problems with sterilization, that the staff were not adequately trained," she testified. The pre–1998 regulations did not contain any directions or requirements regarding sterilization, Long testified. "One of the problems that we had with the old set of regulations was that there was no set standard for processing instruments. There was no very specific guidelines that the facilities had to follow." Because of this lack of guidance, Long said, as a surveyor she observed errors in the way sterilization was done, for example, the employee would not know the correct temperature, pressure or length of time to run the sterilizer; employees would not properly wait for instruments to cool before taking them out of the autoclave; there were problems with sharp instruments tearing through the packaging and compromising the sterility of the package; employees not putting enough water in the autoclave; and facilities were not running a biological control test often enough. In facilities with high staff turnover, Long testified, she might find that the person doing the sterilizing was a poorly trained medical assistant.

Long testified that the health department in 1993 investigated the case of a woman who had died after an abortion. That investigation led to major revisions in the abortion facility regulations, including amendments to include some discharge instructions and follow-up care. Long testified that the death occurred in a licensed facility which had a history of repeatedly failing to properly sterilize its instruments. The health department investigation into the woman's death led to civil penalties being assessed against the facility, and the facility was required to close.

Another change in the regulations that became effective in 1998 requires a facility administrator to have a bachelor's degree or two years' health care experience. The

reason for this change, Long testified, was that "historically, a long time ago, not recently in the last few years, but historically," she found administrators who were not qualified, were inadequately supervising other staff members, and were giving bad medical advice over the phone. She said she read many hospital charts during this same time showing women who had severe post-abortion infections, who had to have operations, or whose health was permanently affected due to complications from an abortion.

Long stopped performing surveys in the field after 1995, but she worked on the 1997 revision of the regulations, and continued to train surveyors. After the new regulations became effective in August of 1998, Long continued to train surveyors, and she did pre-survey conferences over the phone, conducted a workshop for abortion facilities to familiarize them with the new rules, and served as a reference person for facilities to answer questions about compliance with the new rules. During the period between August 1998 and December 1999, no person from an abortion facility contacted her and complained that he or she could not understand the regulations, or that the regulations were too burdensome or too detailed, or that the regulations were vague or ambiguous. During the telephone pre-survey conference, the facility representative has the opportunity to ask the health department about specific interpretation of the regulations, and discuss, for example, how to write the required policies and procedures. She said that it is common and helpful to use another licensed facility's policies as a model, revising as needed to apply to the second facility's operations. Long estimated that one person working full time could draft all of the required policies in "a few days."

Long testified that her relationship over the years with abortion facilities has been a cooperative one, and the facility staff were often grateful to her for pointing out a potential problem and helping them to correct it.

Long did not participate at all in the drafting or passage of the 1999 revision to the abortion regulations that is being challenged in this lawsuit.

She acknowledged that she has never inspected physicians' offices that are not currently licensed, so she has no knowledge of any sterilization problems or other issues in physicians' offices where outpatient surgery other than abortion is performed. She has no knowledge of whether physicians providing abortions in their offices who are currently exempt from abortion facility licensing have any more sterilization problems than private physicians who perform other types of surgeries in their offices. She said sterilization is not only an issue with abortion procedures, but is important for any surgery that invades a sterile body cavity. Long testified that sterilization issues do not change depending on the number of procedures a physician performs. "Sterilization doesn't have anything to do with numbers," she said. She can think of no medical, safety, or health reason to regulate 300 abortion procedures differently from 299 abortion procedures, in terms of sterilization. The regulations on "inspection of surgical instruments" that she helped to draft in 1997 do not address anything unusual or unique about abortion, she said; the standards would be appropriate for any health care facility.

As of December 1, 1999, Long began a new job working on the complaint intake line for the health facility licensing and compliance division. Any member of the public can call the health department's 1–800 number and complain about abortion

facilities or any other health care facility licensed by the health department. Long and the others who answer the toll-free line have a list of specific information that may be given regarding an abortion facility, including identification of the facility or the physician, if the patient is not sure of the name; the date and results of the last survey, and information about any deficiencies identified.

Long stated that the reason facilities are required to post their abortion facility license is so that women walking in to the facility can be sure that the facility has been inspected and meets the regulatory requirements. She said that personal information is required in the application process so that the department would be able to "track bad actors" from one facility to another, to prevent a facility owner who has been cited or shut down from just opening another facility under a different name. Regarding the patient rights section that requires physicians to enhance dignity and self-esteem, Long said that standard "is the same as the patient's rights in any other health care facilities."

The defendants also presented the testimony of Jan Melton–Kissel, an RN who has practiced in obstetrics and who currently works in the health department's bureau of licensing and compliance. Melton–Kissel also has experience conducting surveys of licensed abortion facilities, including physician's offices devoted primarily to abortion. She was involved in the health department's input into and approval of the challenged 1999 amendments. She reviewed the 1997 abortion reporting statistics and determined that the 1999 amendment would affect 12 physicians.

She clarified that the current regulations (both before and after the 1999 amendment takes effect), provide for the charging of a physician with a criminal offense only if the physician is found to be running an abortion facility without a license. Licensed physicians who fail to comply with the regulation's specific requirements for running a facility are subject to civil penalties of $100 to $500 per violation, Melton–Kissel said. The regulations also provide for administrative penalties of $1,000 per violation, with each day of noncompliance counting as a separate violation, and Melton–Kissel acknowledged that the decision of whether and to what extent administrative penalties will be imposed is "in the discretion of the health department." The regulations also provide for suspension and revocation of an abortion facility's license for various forms of noncompliance, and she testified that once a license is revoked, the physician can be criminally prosecuted for continuing to provide abortions to his patients.

To show the state's motivation and reason for adopting the 1999 amendments, the defendants offered an affidavit from Texas Senator Chris Harris, who filed a Senate bill in early 1999 that would have required all physicians performing more than 10 abortions a year to be licensed. That number was later amended to 300, and the amendment was ultimately passed into law by the legislature as part of a lengthy House bill dealing with general health department matters. Defendants also offered the deposition testimony of Texas Senator Leticia Van de Putte, who drafted the version of the amendment that became part of House Bill 2085 when she was a member of the Texas House of Representatives, representing District 115 in San Antonio. Van de Putte was elected as a senator in November 1999.[11]

11. Plaintiffs moved to strike the testimony of Senators Harris and Van de Putte as "inadmissible subsequent legislative history." (Dkt.# 51). The Court has denied the motion

Harris avers that in 1997, during the 75th legislative session, "the Texas Department of Health reported to the legislature a number of examples where young women had either died or been permanently injured due to the negligence of abortion facilities." In response to this information, Harris decided to author new legislation "because I felt the legislature had a responsibility to ensure that women who chose to have an abortion here in Texas are protected." Harris participated in authoring 1997 legislation that amended the previous abortion facility statute to give the health department the authority to report medical personnel to appropriate state licensing boards, impose administrative penalties, and revoke or suspend licenses in emergency situations. The 1997 legislation required the health department to provide a toll-free number "to allow individuals to call and find out if an abortion facility was licensed." The 1997 legislation also instructed the health department to adopt new rules to implement the abortion statute, which resulted in the ad hoc committee process in 1997 to promulgate the version of the rules that became effective in August 1998.

The legislative enactment being challenged in this lawsuit is the passage of the 1999 amendments to the abortion facility statute. Harris's affidavit describes the events leading up to the 1999 amendments as follows:

Prior to the 76th Legislative Session (1999), I reviewed the Texas Department of Health's implementation of these laws. In reviewing the data on abortions performed in the state, it became apparent to me that a number of physicians were circumventing the intent of the law that requires health and safety standards for abortion facilities. These doctors simply filled out a form which stated that abortions did not constitute a significant portion of their practice, even if the number of procedures was in the thousands. Furthermore, I found that many of these doctors were advertising in the yellow pages as abortion facilities. I felt that in order to protect the health and safety of the mother as much as possible, and to meet the intent of the current law, this loophole needed to be closed.

(*See* Harris affidavit, Dkt. # 41, Exh. A, page 2). Harris thus filed a Senate bill which would have amended the abortion facility licensing stature to require all physicians performing more than 10 abortions a year to be licensed as abortion facilities.[12] The Senate Human Services Committee held a public hearing on February 24, 1999, in which the amendment was considered. At the hearing, Harris explained the bill as follows:

Members, last Session we brought, made it to where the Texas Department of Health could inspect abortion clinics. We did this for the safety of women who were getting abortions because we'd had a number of cases where women had died as a result of improper hygiene, improper services being rendered.... There has been, in essence, a little bit of a loophole created and again, this is not to do away with abortions or any of that type thing. The sole purpose of this bill is to give the department of health the,

to strike for the reasons stated in a separate order signed today.

**12.** Harris avers that he filed "Senate Bill 494," which was considered in a Senate Human Services Committee public hearing on February 24, 1999. However, the transcript from that hearing, which is attached to the affidavit, identifies Harris's bill as "Senate Bill 468." Because the record contains no explanation of this discrepancy in the bill number, the Court will assume it to be a typographical error.

the right to go in and inspect and make sure that health standards are met for the safety of the patients.

(*See* Senate Human Services Committee February 24, 1999 transcript, Dkt. # 41, attachment to Exh. A, page 18). Harris explained to the committee that he perceived a loophole in the abortion licensing statute while reviewing the abortion reporting statistics, which all abortion providers are required to provide regardless of whether they are a licensed facility. Harris told the committee that the statistics reflected that some of the physicians claiming an exemption from licensing had reported high numbers of abortions.[13] "[There were] unlicensed facilities where physicians are doing as many as 29, over 2,900 abortions, 2,100, I'm just reading off some of the stats to you of particular facilities, 1,800 and the list goes on and on," Harris said. He stated that the number 10 "wasn't really a magic number ... It could go up or it could go down and I would be alright with it. The main thing I wanna do is get the safety element back in there."

Harris told the committee that he had a continuing concern about safety due to the deaths and injuries that had been reported by the health department in 1997, which led to the 1997 statutory amendments and the 1998 regulatory amendments. "[S]ome of the deaths have occurred or some of the (manglings) [sic] have occurred have been in physician clinics," Harris said. "And the testimony two years ago, ..[t]he last time that this bill was up, there was testimony where they were being done in medical facilities where they hadn't even sterilized the instruments in between procedures on different patients or clients and where women re-

ceived infections that killed 'em or that completely destroyed their reproductive organs.... I want it to be clean, sanitary. I don't wanna hear any more stories about like that young girl in Houston that died about, what was it now, three years ago. To where her insides rotted out.... And that was done by a medical doctor."

During the committee discussion, Senator Gallegos objected to the number 10: "I think in rural areas where women, it's hard to get to a facility or clinic or even a hospital, and if that physician ... does maybe 10 the whole year [and] all of a sudden you want him to ... be licensed," Gallegos said. Harris responded: "You wanna raise it to 50, I don't have a problem with that. Where I do have a problem is where you start getting into huge numbers." Gallegos replied, "I appreciate what you're trying to do here ... if you're looking for a number maybe we can find one."

Kae McLaughlin, executive director of the Texas Abortion and Reproductive Rights League, testified at the hearing in opposition to the bill. "This bill improperly singles out abortion providers for regulations that do not apply to other providers of similar procedures." McLaughlin said. "In light of the violence and terrorist activities surrounding clinics which provide abortion[,] the registration of a physician's office as a site for abortion is a public intimidation tactic." McLaughlin testified that "abortion is a[s] safe or safer than other out-patient surgeries that go unregulated."

Peggy Romberg, executive director of the Texas Family Planning Association, spoke against the bill, stating that her primary problem was with the number 10.

---

**13.** The actual statistics to which Harris was referring do not appear to be in the record of

this case.

Harris asked: "What number would you recommend?" Romberg replied that "my bottom ceiling would be about 300, of OB/GYN that provides abortion services that would be essentially about one a working day." Harris asked: "If it was at that amount would you be, would the bill be acceptable to you?" Romberg replied: "It would be more, certainly more acceptable. I, I certainly would work with you." [14] Harris asked again, "Would it be acceptable?" Romberg did not answer directly, but went on to outline her other concerns about the bill. "I don't have the argument with you with the 2,900 abortions. . . . But . . . we don't want to drive the private doctor who's providing this care out of business. We don't want him on a list. . . . [T]here's a 1–800 number where anyone could call and say, is Dr. Smith licensed to perform abortion and the answer is yes, puts Dr. Smith on a list to get these sort of things on his windshield in his parking lot, to have his private home picketed, to have threats made against his life." Romberg pointed out that she had supported the statutory amendments passed in 1997, which required licensing for clinics and physicians primarily doing abortions. But she testified that private physicians' offices don't generally have the security measures in place as most clinics do, and she urged the health department licensing bureau to look carefully at which of the regulatory requirements would be appropriate to apply to small physician's offices. "[T]hese [regulations] are judged for hospitals and major medical facilities and not for small private doctor's offices," Romberg said.

J. Jacobson, executive director of the American Civil Liberties Union of Texas, testified that "this bill I think is more frankly about getting information out to the more radical anti-choice groups as to which physicians are performing abortions than it is about regulating the health and welfare of the patient. I don't think that there's a particular medical cause of alarm for the physicians who are currently performing this in their office. This bill has a chilling effect on the right to obtain an abortion by reducing the number of physicians who would be agreeable to performing abortions."

Kirk Overbey, a volunteer for the Greater Austin Right to Life Association, attended the hearing and registered in support of the bill, but stated that he did not wish to present oral testimony. At the end of the hearing, the bill was left pending, at Senator Harris' request.

Senate Bill 468 was not passed into law, but similar language amending the abortion statute to regulate physicians who perform 300 abortions or more a year was added by Representative Van de Putte to House Bill 2085, a lengthy bill dealing with general health department matters. House Bill 2085 was adopted by the House on May 27, 1999, and by the Senate on May 29, 1999. The amendment to the abortion facility licensing law became effective on September 1, 1999, but previously exempt physicians are not required to be licensed until January 1, 2000. There is no official legislative history on House Bill 2085 The defendants offered Van de Putte's deposition testimony to explain her motivations in backing the amendments:

Throughout the interim before the 1999 legislative sessions, I had been in discussions with a lot of people concerned with

---

14. The plaintiffs introduced Romberg's deposition, in which she testified that she did suggest the number 300 when pressed by Senator Harris, because the abortion rights community would rather the threshold be 300 than 10, and they didn't have enough votes to completely kill the amendment. She testified that there was no health, safety, or medical basis for the number 300; it was just a "political compromise."

women's health. And we had discussed a number of issues that would be coming before the legislature. During the legislative session, I understood there was a piece of legislation that Senator Harris had proposed that looked particularly at the regulation of physicians who performed abortion procedures.... And knowing that Senator Harris's bill would likely not be passed because Senator Harris's bill was much more encompassing than just the portion that we had on limiting the number of procedures done in the office before that physician needed to have [an abortion facility license]. [I was] looking at a number that would not preclude access for women in this state to seek that procedure, but keeping in mind that we wanted to have as our goal [the] health and safety of the women ... [We] looked at several different numbers in trying to come up with something that would not be so restrictive as to—to impede access.

Van de Putte said she talked to two or three representatives from abortion rights or "pro-choice" organizations, including Romberg. "We went into discussion with them about what is an overly restrictive number," she said. "I knew that the original number that Senator Harris had proposed at ten did seem to be restrictive. ·And it was my understanding that the women ... who were pro-choice, who are very concerned about women's health and safety, felt that the number 300 would be adequate.... No one brought any objections to me on the number 300."

Van de Putte testified that she discussed the number 300 with pro-choice advocates and that she "felt very comfortable as a health professional and as a pro-choice advocate in writing the amendment and with the number 300"

> I rationalized that if a physician did one a day for the number of working days, if you take 52 weeks out of the year, and you know, you get five working days, that would leave us with about 260 working days in a year. Take off maybe about ten for holidays, that would leave you at 250. So averaging out even one a day would leave you with 250. And I felt that with an adequate buffer zone of an additional 50, would leave us with 300 so that a physician in their office, I felt, could comply with that number of procedures being done and giving adequate care to those women who seek that procedure.

Van de Putte stated that she is "adamantly pro-choice," and that the amendment was "absolutely" not intended to limit access to abortion. "There have been women in this state who have died from that procedure," she testified. "I want to make sure that, as a legislator entrusted with the Health and Safety Code of this state, that we make sure that the state does all possible to make sure that the abortion facilities ... provide quality care."

Van de Putte testified that her experience as a practicing pharmacist for 20 years in San Antonio also influenced her in supporting the bill. As a pharmacist, she dispenses prescriptions to women who have just come from having an abortion done, and provides counseling to "make sure they adhere to the treatment regimen of antibiotics and pain medication that are frequently given right after the procedure." She has counseled both patients who have had abortions at clinics and patients who have had abortions at private physicians' offices. Over time she got an idea of several nearby physicians' schedules, because on the days abortions were scheduled, she would see three or four women in the pharmacy who have come straight from having the abortion. Over 20 years, Van de Putte testified, she has

only had concern about one particular physician, "because the women that walked into the pharmacy really seemed traumatized by their experience.... In particular one physician[.] I do not believe, by the level of information that I have to impart as a professional pharmacist in patient counseling, I don't believe that those patients get adequate educational information about the procedure and their post-care from the procedure. This is not the case with other physicians who perform the procedure." Van de Putte said she does not know if that particular physician who caused her concern was subject to licensing or was licensed by the health department.

Van de Putte also answers phone calls to the pharmacy by women with questions about potential post-procedure problems or complications. "We get more phone calls from patients from this one physician than we do any other physician, calling because they can't .. get an answer from the physician's office," she said. These phone calls led Van de Putte to suspect that "because of the number of procedures done in that office setting, I don't know if that physician or their staff has had the adequate follow-up care to those patients."

## V. Conclusions of Law

### A. Standard for Preliminary Injunction

■ To obtain a preliminary injunction, the plaintiffs must prove the following elements:

(1) a substantial likelihood that the plaintiffs will prevail on the merits;

(2) a substantial threat that the plaintiffs will suffer irreparable injury if an injunction is not issued;

(3) proof that the threatened injury to the plaintiffs outweighs any harm that might result to the defendants; and (4) a showing that granting the preliminary injunction will not disserve the public interest. *See Hoover v. Morales,* 164 F.3d 221, 224 (5th Cir.1998); *Sunbeam Prods., Inc. v. West Bend Co.,* 123 F.3d 246, 251 (5th Cir.1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998).

The Court will first examine the applicable law to determine if the plaintiffs have shown a substantial likelihood of success on the merits.

### B. Due Process Claim

#### 1. The *Casey* Decision and the Undue Burden Standard

The Supreme Court of the United States has determined that a woman's decision to terminate a pregnancy is entitled to constitutional protection. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Roe v. Wade,* 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The protection "derives from the Due Process Clause of the Fourteenth Amendment," which declares that "no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Casey,* 505 U.S. at 846, 112 S.Ct. 2791. Thus, *Roe* and *Casey* recognized "a realm of personal liberty which the government may not enter." *Id.* at 847, 112 S.Ct. 2791. "It is settled now ... that the Constitution places limits on a State's right to interfere with a person's most basic decisions about family and parenthood, as well as bodily integrity." *Id.* at 849, 112 S.Ct. 2791. But although the right recognized by *Roe* and *Casey* is a right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child," it must be noted that "[n]ot all governmental regulation is of necessity unwarranted." *Casey,* 505 U.S. at 875, 112 S.Ct. 2791. The *Casey*

decision set out the "undue burden" standard as "the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at 876, 112 S.Ct. 2791.

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Casey,* 505 U.S. at 877, 112 S.Ct. 2791. Similarly, *Casey* held that regulations "designed to foster the health of a woman seeking an abortion" are valid if they do not constitute an "undue burden." *Id.* at 878, 112 S.Ct. 2791. "As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on that right." *Id.*

The *Casey* undue burden analysis was set out in a joint opinion by Justices O'Connor, Kennedy and Souter, which upheld several provisions of a Pennsylvania abortion regulation statute as not constituting an undue burden, but struck down another section that they found did constitute an undue burden. Justice Stevens wrote a separate concurring/dissenting opinion, in which he explains that the proper application of the undue burden test, in his view, would have resulted in the Court overturning the entire challenged Pennsylvania statute rather than only a part of it. *See Casey,* 505 U.S. at 911–22, 112 S.Ct. 2791. Justice Blackmun also wrote a separate concurring/dissenting opinion, in which he argues that the undue burden standard is not rigorous enough to protect the woman's constitutional rights. *See id.* at 922–43, 112 S.Ct. 2791. Blackmun would retain *Roe*'s strict scrutiny test, because "no other is more protective of the woman's fundamental right." *Id.* at 934, 112 S.Ct. 2791. Under the strict scrutiny standards, regulations on abortion "can be upheld if they have no significant impact on the woman's exercise of her right and are justified by important state health objectives." *Id.* at 929 n. 5, 112 S.Ct. 2791.

## 2. The "Large Fraction" Standard for Facial Challenges

In a section of the O'Connor–Kennedy–Souter joint opinion that was joined by Stevens and Blackmun, the Court held that the spousal notification provision of the Pennsylvania statute was "invalid on its face" because "in a large fraction of the cases in which [the provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and is therefore invalid." *Id.* at 895, 112 S.Ct. 2791. In explaining why the provision was facially unconstitutional, the five justices held that "Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of a constitutional inquiry is the group for which the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894, 112 S.Ct. 2791. The five justices rejected the respondents' argument that because "the statute affects fewer than one percent of women who obtain abortions, ... the statute cannot be

invalid on its face." *Id.*[15] "The analysis does not end with the one percent of women upon whom the statute operates," the five justices stated, instead, "it begins there." *Id.* "The women most affected by this law—those who most reasonably fear the consequences of notifying their husbands that they are pregnant—are in the gravest danger." *Id.* at 897, 112 S.Ct. 2791. Thus the "large fraction" language was applied by five justices to facially invalidate the Pennsylvania spousal notification provision.

Chief Justice Rehnquist, joined by Justices White, Scalia, and Thomas, wrote a concurring/dissenting opinion stating that "[w]e believe that *Roe* was wrongly decided, and that it can and should be overruled." *Id.* at 944–79, 112 S.Ct. 2791. Rehnquist, White, Scalia and Thomas would hold that "States may regulate abortion procedures in ways rationally related to a legitimate state interest." *Id.* at 966, 112 S.Ct. 2791.

### 3. The *Salerno* "No Circumstances" Test for Facial Challenges

Chief Justice Rehnquist, dissenting from the *Casey* joint opinion's conclusion that the spousal notification provision was facially invalid, recognized that the joint opinion had applied a "large fraction" test for facial challenges to abortion laws that differed from the general "no circumstances" test set out in *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Rehnquist thus dissented from the use of the "large fraction" test:

> Furthermore, because this is a facial challenge to the Act, it is insufficient for petitioners to show that the notification provision "might operate unconstitutionally under some conceivable set of circumstances." [citing *Salerno* ]. Thus, it is not enough for petitioners to show that, in some "worst case" circumstances, the notice provision will operate as a grant of veto power to husbands. Because they are making a facial challenge to the provision, they must "show that no set of circumstances exists under which the [provision] would be valid." [citing *Salerno* ]. This they have failed to do.

*Casey,* 505 U.S. at 972–73 & n. 2, 112 S.Ct. 2791 (Rehnquist, J., dissenting, joined by White, Scalia and Thomas).

Several months after the *Casey* decision was released, two different panels of the Fifth Circuit issued seemingly contradictory decisions in facial challenges to abortion statutes. On August 17, 1992, a panel of the Fifth Circuit rejected a facial challenge of a Mississippi informed consent statute because—in light of *Casey's* holding that substantially identical provisions of the Pennsylvania Act were facially constitutional—the plaintiffs did not meet the *Salerno* "no circumstances" test. *See Barnes v. Moore,* 970 F.2d 12, 14 (5th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992). "The *Casey* joint opinion may have applied a somewhat different standard in striking down the

---

15. The evidence before the court showed that the spousal notification provision "imposes almost no burden at all for the vast majority of women seeking abortions." *Id.* at 894, 112 S.Ct. 2791. Only about 20 percent of the women who obtain abortions are married. Of that 20 percent, about 95 percent notify their husbands of their own volition. Therefore, "the effects of [the provision] are felt by only one percent of the women who obtain abortions." *Id.* Of that one percent who do not want to notify their husbands, some may be able to do so without adverse consequences or may qualify for one of the exceptions; therefore the provision will operate unconstitutionally for "fewer than one percent of women seeking abortions." *Id.*

spousal notification provision of the Pennsylvania Act, not in issue here," *Barnes,* 970 F.2d at 14 (citing 112 S.Ct. at 2829, which contains the "large fraction" language). "Nevertheless," the *Barnes* panel wrote, "we do not interpret *Casey* as having overruled, *sub silentio,* longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes." *Id.* at 14 n. 2. However, even though it rejected *Casey's* "large fraction" language as inconsistent with *Salerno,* the *Barnes* panel stated that it was applying the *Casey* undue burden standard.

> [I]n clarifying what they meant by an "undue burden," the authors of the [*Casey*] joint opinion stated that they were "set[ting] forth a standard of general application." Applying that standard, we conclude that the differences between the Mississippi and Pennsylvania Acts are not sufficient to render the former unconstitutional on its face.

*Id.* at 15 (citation omitted) In September 1992, about a month after the release of the *Barnes* opinion, another Fifth Circuit panel found that a Louisiana abortion statute was facially unconstitutional under *Casey,* even though the statute allowed abortions to save the life of the mother and therefore arguably passed muster under *Salerno. See Sojourner T v. Edwards,* 974 F.2d 27, 31 (5th Cir.1992).[16] *Sojourner T* also recited and applied the undue burden standard.

Individual Supreme Court justices subsequently expressed their views on what impact *Casey* had on the *Salerno* standard. In November 1993. the Supreme Court denied certiorari in *Ada v. Guam Society of Obstetricians and Gynecologists,* 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992), in which the Ninth Circuit had struck down as facially unconstitutional a Guam statute outlawing all abortions except in cases of medical emergency. Justice Scalia, joined by Chief Justice Rehnquist and Justice White, dissented from the denial of certiorari, arguing that the law was not facially unconstitutional under *Salerno* because a set of circumstances existed under which it would be valid; namely, for abortions conducted after viability. *Id.* at 634, 113 S.Ct. 633. Scalia's dissent contended that "[t]he Court did not purport to change [*Salerno's*] well-established rule last Term in [*Casey* ]."

In an April 1993 denial of application for stay of a pending appeal of a decision rejecting a facial challenge to a North Dakota abortion regulation, Justice O'Connor, joined by Justice Souter in a concurring opinion, expressed her disagreement with the Eighth Circuit's conclusions that "the *Salerno* standard applied" to facial challenges of abortion laws and that *Casey* "did not counsel a different result." *See Fargo Women's Health Organization v. Schafer,* 507 U.S. 1013, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993) (discussing the Eighth Circuit's ruling in *Fargo v. Schafer,* 1993 WL 603600 (8th Cir. March 30, 1993)). "In my view," O'Connor wrote, "the approach taken by the lower courts is inconsistent with *Casey.* In striking down Pennsylvania's spousal-notice provision, we did not require petitioners to show that the provision would be invalid in all circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.' " *Id.*

A month after O'Connor's statement, the Fifth Circuit rejected a facial challenge to

---

**16.** *See also Okpalobi v. Foster,* 190 F.3d 337, 354 (5th Cir.1999) (characterizing *Sojourner T* as an application of the *Casey* test for facial challenges rather than the *Salerno* test).

a Mississippi parental consent statute, citing the "no circumstances" test previously followed in *Barnes*, 970 F.2d at 14. *See Barnes v. State of Mississippi*, 992 F.2d 1335, 1342–43 (5th Cir.), *cert. denied*, 510 U.S. 976, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993).[17] The court again, however, recited and applied the "undue burden" standard, holding that "[a]s long as *Casey* remains authoritative, the constitutionality of an abortion regulation thus turns on an examination of the importance of the state's interest in the regulation and the severity of the burden that regulation imposes on the woman's right to seek an abortion." *Barnes*, 992 F.2d at 1338.

In 1994, the *Casey* case itself, having been remanded to the Third Circuit for a hearing on severability, came back before Justice Souter—in his capacity as Circuit Justice—on an application for stay. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 510 U.S. 1309, 1310–11, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994). In his opinion denying the stay, Souter stated his approval of the Third Circuit's application of the "large fraction" test to the facial challenge, noting that "For the purposes of this opinion, I join the applicants and the court below in treating the joint opinion in *Casey*, [505 U.S. at 843, 112 S.Ct. at 2803], as controlling, as the statement of the Members of the Court who concurred in the judgment on the narrowest grounds." *Id.* at 1311 n. 2, 114 S.Ct. 909.

In 1996, the Supreme Court denied certiorari in an Eighth Circuit case which invalidated a South Dakota parental notification statute. *See Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996). The Eighth Circuit had applied the *Casey* "large fraction" test in finding that the statute was facially unconstitutional. *See Planned Parenthood v. Miller*, 63 F.3d 1452, 1463 (8th Cir.1995).[18] Justice Stevens agreed with the denial of certiorari, noting that *"Salerno's* rigid and unwise dictum has been properly ignored" in *Casey* and in other cases "even outside the abortion context." *Janklow*, 517 U.S. at 1175–76 & n. 1, 116 S.Ct. 1582 (noting *Casey's* holding finding an abortion regulation "facially invalid as 'substantial obstacle' to exercise of right in 'large fraction' of cases"). Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, dissented from the denial of certiorari, arguing that the *Miller* case's application of the "large fraction" standard "virtually cries out for our review" because "we have sent mixed signals on the question" of what standard should apply in facial challenges to abortion statutes. *Janklow*, 517 U.S. at 1178, 116 S.Ct. 1582.

In April 1997, the Fifth Circuit discussed the issue in *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1102–04 (5th Cir.), *cert. denied*, 522 U.S. 943, 118 S.Ct. 357, 139 L.Ed.2d 278 (1997), noting that the Supreme Court in *Casey* "appeared to temper the *Salerno* standard by suggesting that an abortion law is facially invalid if 'in a large fraction of the cases in

---

**17.** The 1993 *Barnes* case involved a challenge by the same plaintiffs as the 1992 *Barnes* case, including Dr. Helen Barnes, to a different Mississippi statute. A dissent by Judge Johnson in the 1993 case asserted that "[i]n a case like this, the majority's application of the 'no-circumstances principle' is just plain wrong." Citing *Casey*, 112 S.Ct. at 2829, Judge Johnson argued that the "proper focus of constitu-

tional inquiry is the group for whom the law is a restriction not the group for whom the law is irrelevant." *See Barnes*, 992 F.2d at 1347 n. 10 (Johnson, J., dissenting).

**18.** In *Miller*, the Eighth Circuit departed from its previous determination that *Salerno* should apply. *See Fargo v. Schafer*, 1993 WL 603600 (8th Cir. March 30, 1993).

which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Id.* at 1102 (quoting *Casey,* 505 U.S. at 895, 112 S.Ct. 2791). However, the Fifth Circuit panel in *Ieyoub* considered itself bound by the holding of *Barnes,* 970 F.2d at 14 n. 2, that *Casey* did not overrule *Salerno.* In addition, the *Ieyoub* opinion noted that "[a]s far as we can tell, the [Supreme] Court appears to be divided 3–3 on the *Salerno–Casey* debate, and it would be ill-advised for us to assume that the Court will abandon *Salerno* because three members of the Court now desire that result. We decline to speculate about the outcome of this disagreement among the Justices of the Supreme Court." *Ieyoub,* 109 F.3d at 1103–04 & n. 5. "We also respectfully decline, for the reasons stated above, Justice Stevens' invitation [in *Janklow,* 517 U.S. at 1176 n. 2, 116 S.Ct. at 1583 n. 2] to reconsider the wisdom of our decision in *Barnes.*" The *Ieyoub* case went on to hold, however, that "whether viewed under *Casey* or *Salerno,* [the challenged Louisiana parental notification statute] is unconstitutional on its face." *Id.* at 1104.[19]

On June 16, 1997, the Supreme Court, in a per curiam opinion, applied the *Casey* undue burden standard in analyzing the lower court's denial of a preliminary injunction to enjoin the enforcement of a Montana statute restricting performance of abortions to licensed physicians. *See Mazurek v. Armstrong,* 520 U.S. 968, 976, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). The Court concluded that the respondents were not entitled to a preliminary injunction because they had not shown that either the purpose or the effect of the statute was to create a substantial obstacle to a woman seeking an abortion. *Id.* at 973–74, 117 S.Ct. 1865. The Court did not discuss the *Casey–Salerno* issue regarding the proper standard for facial challenges. Justices Stevens, joined by Justices Ginsburg and Breyer, dissented, contending that the Court should have denied certiorari because of the procedural posture of the case.[20]

In March 1999, Judge Porteus in the Eastern District of Louisiana struck down Louisiana's "partial birth abortion" statute as facially unconstitutional, noting that "[t]his Court acknowledges that the *Salerno* standard is inconsistent with the rule set forth in *Casey,* however, the Fifth Circuit has not abandoned the *Salerno* standard and this court is compelled to follow such precedent." *Causeway Medical Suite v. Foster,* 43 F.Supp.2d 604, 611–12 (E.D.La.1999). Judge Porteus went on to apply the undue burden standard and find

**19.** The Fifth Circuit, after a poll of the judges, denied rehearing *en banc. See Causeway Medical Suite v. Ieyoub,* 123 F.3d 849 (5th Cir.1997).

**20.** Ten days after the issuance of the *Mazurek* decision, the Supreme Court issued the decision in *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (holding that asserted right to assistance in committing suicide was not a fundamental liberty interest protected by the due process clause). The Court, in an opinion written by Chief Justice Rehnquist and joined by Justices O'Connor, Scalia, Kennedy and Thomas, noted in a footnote that "[t]he District Court determined that *Casey's* "undue burden" standard, not the standard from *United States v. Salerno,* governed the plaintiff's facial challenge to the assisted-suicide ban." *Washington,* 521 U.S. at 708 n. 5, 117 S.Ct. 2258 (citations omitted). However, the Court did not further discuss the *Casey–Salerno* issue because the facial challenge was not a part of the case by the time it reached the high court. The only issue before the Court was the Ninth Circuit's "as-applied" holding, *id.* at 709 n. 6, 117 S.Ct. 2258, and the Court went on to decide that only a "rational basis" test should apply because the right at issue was not a fundamental liberty interest protected by the Due Process Clause. *See Glucksberg,* 521 U.S. at 728, 117 S.Ct. 2258.

the statute facially unconstitutional under *Salerno. Id.* at 612.

In a First Amendment case issued in June 1999, Justice Scalia characterized the *Casey* "large fraction" test for facial challenges to abortion laws as a Court-created exception to the general *Salerno* rule, an exception with which he heartily disagreed. *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1871, 144 L.Ed.2d 67 (1999):

> I am aware, of course, that in some recent facial-challenge cases the Court has, without any explanation, created entirely irrational exceptions to the "unconstitutional in every conceivable application" rule, when the statutes at issue concerned hot-button social issues on which "informed opinion" was zealously united. *See Romer v. Evans,* 517 U.S. 620, 643, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (SCALIA, J., dissenting) (homosexual rights); *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (abortion rights).

*Morales,* 119 S.Ct. at 1871 (Scalia, J., dissenting). The *Casey* pinpoint citation, 505 U.S. at 895, which Scalia provides as an example of an exception to the *Salerno* rule, contains the *Casey* joint opinion's language (joined by five justices) which applies the "large fraction" test to the Pennsylvania spousal notification provision.

In September 1999, the Fifth Circuit issued *Okpalobi v. Foster,* 190 F.3d 337 (5th Cir.1999), which struck down as facially unconstitutional a Louisiana statute which made abortion providers liable in tort for damages to the woman, and, arguably, for damages to the unborn fetus. The opinion in *Okpalobi* notes the "tension" between *Casey* and *Salerno* regarding "the proper standard of proof when a plaintiff asserts a facial challenge to a statute imposing restrictions on abortion." *Id.*

at 353. Additionally, *Okpalobi* acknowledged that "the Fifth Circuit jurisprudence on this question is not a model of clarity." *Id.* at 354 (citing *Barnes,* 970 F.2d at 14, and *Sojourner T,* 974 F.2d at 27). However, the court "decline[d] to address any internal inconsistency in this area of Fifth Circuit jurisprudence because, regardless of whether [the statute at issue] is tested under *Salerno* or under *Casey,* the Act is unconstitutional on its face." *Id.*

### 4. Application of Standards

■ This Court is now called upon to determine the proper standard to apply to this facial challenge to an abortion regulation. It appears that five justices, a majority of the Supreme Court, approved language in *Casey* holding that a law restricting abortions constitutes an undue burden, and hence is facially invalid, if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. 2791. However, the Fifth Circuit points out that the *Salerno* standard for facial challenges was not explicitly overruled in *Casey. See Okpalobi,* 190 F.3d at 354; *Ieyoub,* 109 F.3d at 1103-04. In the last two cases to face the issue, the Fifth Circuit applied both standards and thus avoided having to definitively choose one standard or the other. *See Okpalobi,* 190 F.3d at 354; *Ieyoub,* 109 F.3d at 1103-04. Therefore, this Court will also undertake to analyze the instant case under both standards for facial challenges, noting that the "undue burden" standard will be applied in either instance.

After *Okpalobi* discussed the facial challenge issue, it then proceeded to examine the case under the *Casey* undue burden framework, holding that "under *Casey* and *Sojourner T,* we are directed to examine

(1) the purpose and (2) the effect of [the challenged provision]. As the *Sojourner T / Casey* burden is disjunctive, a determination that either the purpose or the effect of the Act creates such an obstacle is fatal." *Okpalobi*, 190 F.3d at 354. The Court found that "the State's proffered legislative purpose simply is not credible," and additionally that the statute would have the effect of unconstitutionally chilling physicians' willingness to provide abortions. *Id.* at 357. "A measure that has the effect of forcing all or a substantial portion of a state's abortion providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a previability abortion, thus constituting an undue burden under *Casey*." *Id.*[21]

#### a. The Purpose of the Statute

In determining whether a statute has an impermissible purpose, the Fifth Circuit "has looked to various types of evidence, including the language of the challenged act, its legislative history, the social and historical context of the legislation, or other legislation concerning the same subject matter as the challenged measure." *Okpalobi*, 190 F.3d at 354. Regarding post-enactment testimony from individual legislators, the Fifth Circuit has not held that such evidence is inadmissible, but has held that post-enactment statements should be looked upon with caution and should not be relied exclusively or allowed to contradict the official legislative record. *See Foreman v. Dallas County*, 193 F.3d 314, 322 (5th Cir.1999) ("No one legislator, or even a group of three legislators, has suffi-

cient personal knowledge to declare the overall intent of the Texas legislature"); *see also Quarles v. St. Clair*, 711 F.2d 691, 705 (5th Cir.1983) (holding that "it is well accepted that even explicit post-enactment, retrospective, statements of intent are to be looked on with caution"). Accordingly, in determining whether the 1999 amendments were enacted with the purpose of placing a substantial obstacle in the path of a woman seeking an abortion, *Okpalobi*, 190 F.3d at 354, this Court will rely primarily on the official legislative history in the record—the transcript of the February 24, 1999 Senate Human Services Committee meeting in which the amendments were introduced as a senate bill, and the materials documenting the 1997–98 ad hoc committee process to promulgate the regulations that the 1999 amendments will apply to the plaintiffs.[22] Fifth Circuit precedent requires that Harris's and Van de Putte's testimony be given lesser weight than the official legislative history, but the Court notes that the challenged testimony in many respects merely confirms the official legislative history.

Even if the Court looks solely at the official legislative history, it cannot be concluded that the challenged 1999 amendments were passed for an improper purpose. Senator Harris, who first introduced the provision, emphasized that "this is not to do away with abortions" and explained his concerns that some physicians were evading the intent of the licensing statute by stating that their offices were not "used primarily for the

**21.** Alternatively, the Court found that the Louisiana statute was unconstitutionally vague and facially invalid regardless of the *Casey–Salerno* issue "A vague law that chills the exercise of a constitutional right will succumb to a facial challenge even when [the law] could have had some legitimate application.... Thus, the standard-of-proof question, see [*Salerno* ], is not a factor in deciding

the State's challenge to the district court ruling on vagueness." *Okpalobi*, 190 F.3d at 358.

**22.** This Court, in a separate order signed today, denies the plaintiffs' motion to strike Harris's and Van de Putte's testimony, for the reasons stated therein.

purpose of performing abortions," when the reported statistics showed that they were performing 1,800 to 2,900 abortions a year. In addition, although the promulgation of the regulations themselves in 1997 and 1998 is not being directly challenged in this lawsuit, it is significant to note that the legislative history there shows that a diverse committee of medical experts and both abortion rights advocates and anti-abortion activists was assembled to draft a set of regulations that would improve the safety of women without decreasing access. The health care professionals who participated in the 1997–98 committee process were genuinely concerned about improper sterilization techniques and other problems in abortion clinics that had resulted in severe infections and even two deaths of women after abortions. Accordingly, the regulations effective in 1998 were "reasonably directed to the preservation of maternal health." *Casey*, 505 U.S. at 900, 112 S.Ct. 2791. The 1999 amendment was intended to apply these carefully drafted regulations to physicians' offices providing a large number of abortions. Senator Harris was concerned about the possibility of improper sterilization that had the potential to cause injury and death in unregulated physicians' offices that were, for all practical purposes, operating like abortion clinics. Harris referred repeatedly to his goal to protect the "safety of women who were getting abortions because we'd had a number of cases where women had died as a result of improper hygiene, improper services being rendered." Although the number 300 is not tied to any particular

medical evidence of increasing risk—and the evidence contains no evidence of any infection or other problems with the specific 12 physicians affected by the 1999 amendments—it appears that the intent was to come up with a specific cutoff number to provide a bright line for the enforcement of the licensing requirement. In addition, the number 300 appears to have been chosen at least in part after input from abortion rights advocates. There is no evidence of any intent or purpose to place obstacles in the path of women seeking abortions. On the contrary, the application of the already existing (and unchallenged) regulations to physicians' offices providing a large number of abortions appears to have been "designed to foster the health of a woman seeking an abortion." *See Casey*, 505 U.S. at 878, 112 S.Ct. 2791.[23] Accordingly, the Court concludes that the challenged legislation was not passed with an improper purpose.

### b. The Effect of the Statute

The plaintiffs claim that the 1999 amendments will have the effect of placing a substantial obstacle in the path of women seeking abortions because the increased cost of compliance with the regulations will cause them to raise their prices for abortions, or in two cases, to stop providing abortions in their offices. *Casey* teaches that "at some point increased cost could become a substantial obstacle." *Casey*, 505 U.S. at 901, 112 S.Ct. 2791. But *Casey* also indicates that a claim of increased cost must be supported by a "showing on the

23. The deposition testimony of Senator Van de Putte merely confirms the conclusions the Court has drawn from the official legislative history. Van de Putte testified that she discussed the number 300 with pro-choice advocates and that she "felt very comfortable" with the number 300, which estimated to be approximately one abortion per working day. Van de Putte stated that she is "adamantly pro-choice," and that the amendment was "absolutely" not intended to limit access to abortion, but to ensure that physicians performing large numbers of abortions are regulated to the same extent as clinics, and to ensure that the women seeking abortions get high quality care.

record." *Id.* In this case, although the physicians cite increased costs, they have not provided any specific credible estimates on exactly how much those costs might be. Dr. Davis estimated that it would be necessary to raise his abortion fees by $25 to $50 per procedure, plus $50,000 to $60,000 in start-up costs to hire a consultant and close his office down for a week to train his employees. However, Davis admitted that his consultant did not review all of the regulations, but only heard him read part of the regulations over the phone. He testified that the consultant would cost $1,000 a day, but he did not attempt to locate a less expensive consultant, and he has not taken the time to compare the various written manuals he currently uses in his office to see if he is already in compliance with some of the regulations required written policies. Davis estimated that drafting the required policies would take three weeks, but Julie Long, the RN who spent many years performing health department surveys of licensed abortion facilities, estimated that it would take one person working full time "a few days" to draft the required polices. The actual number of staff hours required to draft the policies will undoubtedly vary depending upon the size of the office and the written materials that are already on hand, but the Court finds Long's testimony to be credible due to her experience reviewing written policies at abortion facilities.

Dr. Robinson estimates that becoming licensed will cause him to incur costs up to $100 per patient, but his testimony does not appear to support this figure. He will not have to add any staff, and he currently has many written policies already on hand. Dr. Kaminsky has not asked his staff to review the regulations, and he only reviewed them himself for about 45 minutes. Kaminsky admitted that he has not done a general cost estimate on how much it would cost him to comply with the regulations, and he testified that his abortion fees will likely have to be increased, but he did not estimate the amount of the increase. Dr. Smith also predicted increased costs, but admitted that she has not calculated exactly what the costs would be.

Dr. Hansen estimates that he will have to hire two staff members, an RN and a "regulation compliance officer," which will increase his costs about $60,000 a year, or about $60 per patient. But he testified that he would not necessarily raise his abortion fees. The Court finds that this $60,000 estimate is somewhat high, because the evidence does not show that the regulations would require an additional full time employee solely devoted to compliance. Long testified that during the year-long period that the 1998 regulations have been in effect, no abortion facility staff members have complained to her that the regulations were unduly burdensome or were hard to understand. Long said the health department's relationship with abortion facilities is a cooperative one, in which both sides are trying to improve procedures for patients, and where the health department is available to explain or clarify the regulations. Therefore, although it undoubtedly will take some staff time to ensure compliance, the evidence before the Court does not establish that a permanent "regulation compliance officer" is necessary The regulations would require Hansen to hire either an LVN or RN, but his estimate included the higher salary of an RN, when an LVN would satisfy the regulations.

Moreover, a court considering an abortion regulation does not look at the regulation's burdens in isolation. The Fifth Circuit has held that "the constitutionality of an abortion regulation [under *Casey* ] turns on an examination of the importance

of the state's interest in the regulation and the severity of the burden that regulation imposes on the woman's right to seek abortion." *Barnes v. Mississippi*, 992 F.2d 1335, 1339 (5th Cir.), *cert. denied*, 510 U.S. 976, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993). Under this balancing approach, the Court concludes that the benefits sought by the state in enacting the 1999 amendments justify the increased costs that might be incurred by the physicians. Texas already regulates abortion clinics and physicians' whose office are used primarily for abortion, and the state's evidence indicates that physicians' offices where large numbers of abortions are provided begin to resemble abortion clinics and should be subjected to the same regulations as abortion clinics. Davis has 15 employees, including another physician who also performs abortions. Kaminsky also has another physician helping him perform abortions, and 11 other staff members. Robinson has two other physicians helping him, and has 14 employees. Kaminsky's office provides about 1,500 abortions a year, and Robinson's office provides 2,211 abortions a year. The evidence indicates that these three offices, particularly, are large enough operations to benefit from regulations appropriate for abortion clinics, and are large enough to potentially expose their patients to risks comparable to those risks associated with the high volume of abortions performed at abortion clinics. Dr. Hansen admitted that the abortion facility regulations have improved the health conditions for women in abortion clinics, and acknowledged that if a private physician is performing 2,000 abortions a year, then regulations requiring a more formal office administration could be of benefit. Dr. Lawson, who helped draft the 1999 regulations for the health department, testified that as more procedures are performed and more tasks are delegated to the physician's staff, the

more the office can benefit from a set of formal requirements and procedures. Long, the RN who performed surveys of abortion facilities for many years, testified that she observed many problems with sterilization in abortion facilities, especially before the regulations provided explicit directions on sterilization and required written sterilization and infection control policies. The Court concludes that the 1999 amendments will provide a benefit to Texas women seeking abortions by ensuring that proper sterilization procedures are in place at physicians' offices where 300–plus abortions are performed, just as the current regulations ensure the safety of women at abortion clinics. In addition, the health department's enforcement of the law will be aided by the establishment of a bright line cutoff of 300 for the number of procedures that will subject a physician to regulation. On the current record, the Court finds that the undetermined fee increases that the physicians predict, weighed against these enforcement and health benefits, do not constitute an undue burden on women seeking abortions. "Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Casey*, 505 U.S. at 874, 112 S.Ct. 2791.

The regulatory "fit" is less appropriate for the offices of Hansen and Smith, who have only four employees each, and whose practices do not resemble clinics to the same extent as the other plaintiffs' practices. Compliance with the regulations would undoubtedly impose costs on Smith and Hansen, although neither physician

has estimated those costs precisely. Significantly, however, Hansen testified that even if he stops providing abortions in his private practice, he will continue providing abortions in Austin at the licensed abortion facility where he is medical director. Similarly, even if Smith closes her practice in Denton, she will continue providing abortions in a Dallas clinic which is 45 to 90 minutes away from her office. Therefore, although Hansen and Smith are understandably upset at the possibility of having to stop providing abortions in a private office setting, it is important to note that even if the unknown increased costs will require them to close their office abortion practices, their patients will not be left without a local abortion provider.

It should also be noted that the Court has before it a facial challenge to the 1999 amendments, not an "as-applied" challenge by Hansen or Smith. Under the *Casey* standard for facial standards, an abortion law is facially invalid if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791. Although the increased costs of this regulation might force these two apparently very capable physicians to stop providing abortions in their offices,[24] it must be noted that Smith and Hansen are only two abortion providers out of the 12 providers affected by the 1999 amendments, and only two out of the more than 50 providers in Texas. Additionally, both physicians will continue providing abortions in a clinic setting. Therefore, whether or not ⅙ could be considered a "large fraction," the Court

concludes that Smith's and Hansen's decisions not to become licensed will not operate as a substantial obstacle to a woman's choice to undergo an abortion in Texas, or even in Denton or Austin. *See Casey*, 505 U.S. at 895, 112 S.Ct. 2791. In contrast, the statute overturned by the Fifth Circuit in *Okpalobi* would have had "the effect of forcing all or a substantial portion of [Louisiana's] abortion providers to stop offering such procedures." *Okpalobi*, 190 F.3d at 357. In that case, the Fifth Circuit found that "[t]he evidence shows that the Plaintiffs, who currently provide approximately 80% of all abortions in the state, will be forced to discontinue their abortion practice if Act 825 goes into effect." *Id.* There is no evidence in this record, however, that the 1999 amendments being challenged in this case would have anything near so drastic an effect.

The plaintiffs cite *Greenville Women's Clinic v. Bryant*, 66 F.Supp.2d 691 (D.S.C. 1999), in which a South Carolina district court struck down abortion facility regulations because, *inter alia*, they imposed excessive costs on physicians that would cause abortion fees to increase. The Court points out, however, that the plaintiff physicians in *Greenville* provided the court with very detailed and specific cost estimates, and the court specifically found that "the increased cost of providing abortions resulting from this regulation will prevent a significant number of women from obtaining an abortion or, at a minimum, delay them from obtaining the abortion." *See Greenville*, 66 F.Supp.2d at 716–718.[25] In contrast, the record in this case

---

24. The Court has insufficient evidence regarding specific anticipated costs before it to make a factual finding that Smith and Hansen would have no option but to close their practices. It does appear that both Smith and Hansen believe that they will have to close their practices.

25. *Greenville* also involved regulations which were significantly more onrous than the regulations involved in this lawsuit, and which were imposed upon private physicians performing more than 60 abortions per year. *See Greenville*, 66 F.Supp.2d at 694–95. The South Carolina regulations mandated that all

does not show that the regulation will prevent a significant number of women from obtaining abortions. Accordingly, the Court concludes that the 1999 amendments are not facially unconstitutional as a violation of plaintiffs' patients' due process rights under the *Casey* "large fraction" test.

Applying the *Salerno* standard to this facial challenge would produce the same result. *Salerno* provides that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. In this case, the Court must conclude that circumstances exist under which this statute would not constitute an undue burden to women seeking an abortion. The evidence shows that the practices of Drs. Davis, Kaminsky and Robinson, with more than a dozen employees each and several physicians providing abortions, are large enough to potentially pose risks to patients comparable to risks encountered in abortion clinics, and are large enough both to benefit from a more formal administration and to absorb the costs of compliance with the regulation. The evidence in this record shows that the 1999 amendments, at most, would eliminate the office practices (but not the clinic practices) of only two out of the more than 50 abortion providers in Texas, and would, at most, cause abortion fees to increase an undetermined amount at the offices of three physicians out of the more than 50 abortion providers in Texas. The Court thus concludes on the evidence before it that the challenged amendments would not operate to create an undue burden in all circumstances and are therefore not facially unconstitutional under *Salerno*.

Because the Court has concluded on the current record that the challenged amendments do not have the purpose or effect of creating an undue burden on Texas women's right to seek an abortion, and are not facially unconstitutional under either *Salerno* or *Casey*, the Court concludes that the plaintiffs (on behalf of their patients) have not shown a substantial likelihood of success on their Fourteenth Amendment due process claim.

## C. Equal Protection Claim

The Equal Protection Clause commands that no state shall "deny to any person

---

abortion patients receive specific medical tests that were not medically necessary, failed to provide for confidentiality of patient records, conferred broad discretion upon health department officials to impose additional case-by-case requirements to ensure the "best practices as interpreted by the department," and set out numerous "overwhelmingly" detailed requirements for the design and construction of abortion facilities that would have immediately required physical plant renovations costing up to $27,000. In addition, evidence concerning the drafting of the South Carolina regulations indicated that the drafters did not seek—and in fact affirmatively rejected—the assistance of medical experts experienced in abortion practice to determine if the regulations were appropriate for a first-trimester abortion procedure. Finally, in *Greenville*, the record before the court contained no evidence that any abortion providers were providing inadequate care to women, and the record contained clear evidence that the regulations were not promulgated in response to any perceived public health problem in South Carolina. All of the witnesses in *Greenville* testified that they were unaware of any case where a woman suffered serious medical complications after an abortion in South Carolina. The court found that "[t]here is no evidence in this case that a first trimester suction curettage abortion has ever resulted in a woman's death in this state." See *Greenville*, 66 F.Supp.2d at 704. Accordingly, this Court finds *Greenville's* finding of an undue burden to be distinguishable from the case at bar.

within its jurisdiction the equal protection of the laws." This provision creates no substantive rights. *See Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). "Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Id.* However, courts must deal with "the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). The Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.*

Classifications that involve a fundamental right require strict judicial scrutiny. *See, e.g., Rublee v. Fleming*, 160 F.3d 213, 217 (5th Cir.1998) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Under strict scrutiny review, the classification must be narrowly tailored to serve a compelling state interest. Other classifications have been subjected to "intermediate" review. *See, e.g., United States v. Virginia*, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (classification based on sex); *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (classification based on illegitimacy). Under intermediate scrutiny, the court examines whether the challenged classification is directly and substantially related to a legitimate and important governmental interest. *See Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

The "rational basis" standard, although significantly less rigorous than the "strict scrutiny" standard, is not without teeth:

"[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632, 116 S.Ct. 1620. "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633, 116 S.Ct. 1620. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 634, 116 S.Ct. 1620.

### 1. *Casey's* Effect on Equal Protection Analysis

This Court must determine which standard of review—strict scrutiny, intermediate review, or rational basis—should be used in this equal protection challenge to a state regulation on the abortion procedure. The case law on this issue, particularly post-*Casey*, is sparse and somewhat inconsistent. Cases pre-dating the *Casey* decision have held that because *Roe v. Wade* established a "fundamental" right to abortion during the first trimester, then any regulation classifying abortion differently from similar medical procedures must be justified by a "compelling reason." *See, e.g., Friendship Medical Center v. Chicago Board of Health*, 505 F.2d 1141, 1149–53 (7th Cir.1974) (striking down state law that "regulate[d] comprehensively physicians who perform abortions, while at the same time leaving other medical procedures, often much more complex and dangerous in terms o[f] the patient's health, up to the good judgment of the physician"), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *Mahoning Women's Center v. Hunter*, 610 F.2d 456, 460–61

(6th Cir.1979) (affirming district court's finding that sweeping regulatory scheme applied only to abortions violated equal protection because it was not justified by a compelling state interest), *vacated on other grounds*, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980). The district court in *Mahoning* found that "[w]here fundamental rights are involved, a compelling interest is required in order to differentiate in treatment between two classes which do not differ on grounds related to the purpose of the challenged ordinance." *Mahoning Women's Center v. Hunter*, 444 F.Supp. 12, 17 (N.D.Ohio 1977), *aff'd*, 610 F.2d 456, 460–61 (6th Cir.1979), *vacated on other grounds*, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980).

> Although the purpose of Chapter 98.00 is to effectuate "the highest standards of health care," such ordinance regulates only those physicians who would perform abortions while leaving other comparable medical procedures to the discretion of the attending physician. Thus, Chapter 98.00 differentiates between medical procedures which are without distinction as to surgical risk in a fashion which adversely affects the exercise of fundamental rights. Defendants have failed to demonstrate such a compelling interest as to warrant this regulation.

*Mahoning*, 444 F.Supp. at 17. Other pre-*Casey* decisions, although recognizing that *Roe* created a fundamental right to choose abortion, found that the challenged law did not "impinge" on that right, and that therefore rational basis review would apply. *See Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). *Maher* held that an indigent woman's difficulty in procuring an abortion was caused by her poverty, rather than by a state's policy decision not to fund abortions. *Id* at 473–74, 97 S.Ct. 2376. Therefore, because "the indigenc[e] . . . is neither creat-ed nor in any way affected by the Connecticut regulation," the regulation "places no obstacles, absolute or otherwise, in the pregnant woman's path to an abortion." *Id.* at 474, 97 S.Ct. 2376. Accordingly, the Court "conclude[d] that the Connecticut regulation does not impinge upon the fundamental right recognized in *Roe.*" *Id.* Because the regulation at issue did not "impinge" on the fundamental right, rational basis review applied. *Id.* The Eighth Circuit in *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377, 1380–81 (8th Cir.1989), held that although "the Court has required that if a state law impinging on abortion is to be held valid, it must further a compelling state interest—a strict scrutiny test," application of the strict scrutiny test "is triggered only when the state law places 'sufficiently substantial and not de minimus' regulations on abortion." *Id.* at 1380 (finding that challenged law did not have a "significant impact" on women seeking abortion). The *Webster* decision, applying rational basis review, rejected the plaintiff physicians' equal protection challenge to the law requiring abortion doctors to have surgical privileges at certain hospitals, because the evidence showed that the requirement was equally applied to procedures other than abortion. *Id.* at 1381. The Court noted that abortion was not singled out for different treatment, because "the state requires that such backup care be available to patients undergoing any outpatient surgery." *Id.* Similarly, in *Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352 (6th Cir.1984), the Sixth Circuit, in an equal protection challenge to a regulation on "freestanding surgical outpatient facilities" ("FSOF"), held that "no suspect classification is involved here since the State has chosen to regulate all FSOF's, not just abortion clinics." *Id.* at 358 (also noting that the plaintiff physicians in that case

were asserting only their own, not their patients', equal protection rights). The *Reizen* decision specifically distinguished *Mahoning, supra,* on the grounds that the regulation found unconstitutional in *Mahoning* targeted only abortion clinics, while the regulation in *Reizen* was generally applicable to all outpatient surgery procedures. *Reizen,* 743, F.2d at 358. n. 4. Additionally, *Reizen* concluded that Michigan's decision to regulate FSOF's where abortions were performed, but not to regulate physicians' private offices where abortions were performed, had a "reasonable basis" due to actual differences between the two settings:

> The trial court found, based on the evidence, that physician responsibility may differ depending upon the setting in which a physician practices. For example, the district court found that in a private office practice the physician will likely have direct control over the staff and the functioning of the office, but in a clinic owned and operated by lay personnel, physicians may be mere employees lacking control over other areas of the clinic's functioning, such as the hiring, training and supervision of support personnel, the acquisition of medical equipment, or [the] design of the facility.

*Reizen,* 743 F.2d at 359. *Reizen* noted, however, that "[i]f compliance with the FSOF licensing requirements forced abortion clinics either to increase dramatically their charges for performing abortions or if the cost of compliance was so prohibitive that they ceased to perform abortions, then a woman's ability to exercise her fundamental right to choose to terminate her pregnancy would be seriously impaired." *Id.* at 358.

The issue now before the Court is whether and to what extent the *Casey* decision changed the analysis of equal protection claims to abortion regulations. *Ca-*

*sey* itself involved only a due process claim, not an equal protection claim. However, the *Casey* joint opinion held that the application of the strict scrutiny standard to all first-trimester abortion regulations created "tension" with regard to "the holding in *Roe* itself that the State has legitimate interests in the health of the woman and in protecting the potential life within her." *Casey,* 505 U.S. at 871, 112 S.Ct. 2791. To address this contradiction, the joint opinion set out the undue burden standard as "the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at 876, 112 S.Ct. 2791 Therefore, *Casey* instructs us, "[r]egulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden." *Id.* at 878. "As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on that right." *Id.*

After *Casey,* the Supreme Court continues to refer to a woman's right to choose abortion as one of "certain fundamental rights and liberty interests ... specifically protected by the Due Process Clause." See *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). In *Glucksberg,* the Court rejected the plaintiffs' claim that the right to commit suicide or to have assistance in committing suicide was one of the liberties protected by the Due Process Clause. *Id* at 727, 117 S.Ct. 2258. The plaintiffs in *Glucksberg* and its companion case. *Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997), had relied on *Casey* to argue, for the purpose of their equal protection claim, that assistance in suicide was a "fundamental right" requiring strict

scrutiny review. The Court reviewed *Casey's* discussion of fundamental rights, including the right to choose abortion, then distinguished *Casey* from the case at bar, concluding that the assisted suicide ban at issue did not implicate a fundamental right. *Glucksberg*, 521 U.S. at 727–28, 117 S.Ct. 2302.[26] In a concurring opinion, Justice Souter opines that "We have made it plain, of course, that not every law that incidentally makes it somewhat harder to exercise a fundamental liberty must be justified by a compelling counterinterest." *Glucksberg*, 521 U.S. at 767 n. 8, 117 S.Ct. 2258 (Souter, J., concurring) (citing *Carey v. Population Services*, 431 U.S. 678, 685, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (liberty to choose contraception does not "automatically invalidate every state regulation in this area")). Souter then writes that "a state law that creates a 'substantial obstacle,' *Casey, supra,* at 877, 112 S.Ct. at 2820, for the exercise of a fundamental liberty interest requires a commensurably substantial justification in order to place the legislation within the realm of the reasonable." *See Glucksberg*, 521 U.S. at 767 n. 8, 117 S.Ct. 2258 (Souter, J., concurring).

Souter's "commensurably substantial justification" standard does not appear to have been accepted by the other members of the Supreme Court, or applied by any lower Court. But it shows the disagreement and confusion surrounding *Casey's* effect on the equal protection analysis. Very few post-*Casey* decisions in the federal courts contain analysis of an equal protection challenge to an abortion regulation. The Eighth Circuit in *Planned Parenthood v. Dempsey*, 167 F.3d 458, 463 (8th Cir.), *cert. denied,* 528 U.S. 1006, 120 S.Ct. 501, 145 L.Ed.2d 387 (1999), rejected

Planned Parenthood's argument that abortion regulations were still subject to strict scrutiny after *Casey*. *See Dempsey*, 167 F.3d at 464–65, Although its reasoning is not entirely clear, the Eighth Circuit appeared to hold that because *Casey* had set out a new standard of review, that standard, instead of "strict scrutiny," should be applied in the equal protection context as well as the due process context. *See id* (rejecting equal protection claim because statute did not constitute "undue burden" on abortion). In another case, a district court in Montana rejected an equal protection challenge to a parental notice statute under the "rational basis" standard. *See Wicklund v. Lambert,* 979 F.Supp. 1285, 1289 (D.Mont.1997). In *Wicklund,* the plaintiffs had argued that an intermediate scrutiny should apply because the statute at issue applied only to female minors and thus was a "sex-based restriction on access to medical care." *Id.* at 1289. The court rejected this argument, relying on case law holding that a pregnancy-based classification is not necessarily a sex-based classification, and held that the law was "rationally related to its legitimate state interest in protecting the well-being of minors." *Id.*

A district court in South Carolina recently struck down, on, *inter alia,* Equal Protection grounds, regulations similar in some respects to the Texas regulations at issue in this case. *See Greenville Women's Clinic v. Bryant,* 66 F.Supp.2d 691, 737–43 (D.S.C.1999). *Greenville* held that "it has been established since *Roe* that a woman's decision to terminate her pregnancy prior to viability involves the exercise of a fundamental constitutional right." *Id.* at 739. The South Carolina regulation "applies only to abortion providers and directly impacts the exercise of a funda-

---

**26.** In the companion case, *Vacco,* 521 U.S. at 799, 117 S.Ct. 2293, the Court used rational basis review to analyze the equal protection challenge to the assisted suicide ban, relying on *Glucksberg's* holding that no fundamental right was infringed.

mental right. Furthermore. South Carolina imposes no similar requirements upon physicians or clinics performing comparable procedures. Thus, the court ... concludes that [the regulation] must survive strict scrutiny analysis." *Id.* at 740 (striking down comprehensive abortion facility licensing and regulatory scheme "because it is not narrowly tailored to serve [the asserted] compelling state interest" of preserving the health and safety of women seeking abortion services). *Greenville* also held alternatively that the regulations at issue in that case would also be invalidated under rational basis review, because the regulations were not "based upon or designed to address" the "actual differences" between physicians who provide abortions and physicians who provide other similar surgical outpatient procedures in an office setting. *Id.* at 741.

### 2. Physicians' Assertion of Patients' Equal Protection Rights

The parties in the instant case disagree on what standard should be applied to analyze the plaintiffs' equal protection claim. The defendants contend that because physicians are not a suspect class, and because the physicians do not have a fundamental right to perform abortion, rational basis review should apply. The defendants also assert that the plaintiff physicians have no standing to assert their patients' rights in the equal protection context. Finally, the defendants contend that even if the physicians are allowed to assert patients' equal protection rights, the strict scrutiny standard no longer applies after *Casey.*

■ The Court first notes that no party has attempted to argue that physicians, or even physicians who perform abortions, are a "suspect class." The plaintiffs' equal protection argument rests upon the other reason to apply strict scrutiny review—the

fact that the regulation implicates a fundamental right. Similarly, the plaintiffs do not appear to be claiming that they personally, as physicians, have a fundamental right to *perform* abortion, independent of their patients' right to seek an abortion. To the extent that the plaintiffs are asserting their own equal protection rights, therefore, the Court must apply rational basis review. *See Reizen,* 743 F.2d at 358 (noting that because "the plaintiff physicians, in their equal protection argument, were raising their own equal protection rights, not the due process rights of their patients," rational basis review applied).

■ The question of whether, in general, a physician may assert the patient's equal protection rights as well as the patient's due process rights does not appear to have been squarely addressed by the courts. It is well established that physicians who perform abortions have standing to assert the due process rights of their patients when challenging regulations on abortion. *See Singleton v. Wulff,* 428 U.S. 106, 118, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Okpalobi,* 190 F.3d at 350–53. "The general rule, as formulated by the Supreme Court in *Singleton,* is that physicians have standing to raise challenges to laws regulating abortion based on the constitutional rights of their patients because they can adequately represent the patients' interest." *Okpalobi,* 190 F.3d at 353. The reasons for this general rule are that (1) a woman's exercise of her right to choose abortion is "inextricably bound up" with the activities of the physician challenging the regulation; (2) there are two obstacles to a woman's assertion of her own rights in an abortion case. "She may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit," and each individual woman's claim is subject to "imminent mootness" due to the small win-

dow of time between a woman's discovery that she is pregnant and the time at which it is too late to have a safe abortion. *See Okpalobi*, 190 F.3d at 351 (quoting *Singleton*, 428 U.S. at 115–18, 96 S.Ct. 2868).

These reasons for allowing a physician to assert the patient's due process rights would seem to apply equally in the equal protection context. Indeed, several pre-*Casey* equal protection cases, without discussion, allowed the physicians to assert both the patients' equal protection claims and the patients' due process claims. *See, e.g., Mahoning*, 610 F.2d at 458 n. 2; *Friendship*, 505 F.2d at 1152. The defendants have not directed the Court to a case that specifically draws any distinction between equal protection and due process regarding the physician's ability to assert the patient's rights. Moreover, the Supreme Court has cited *Singleton* as authorizing standing to raise third party equal protection rights in non-abortion cases. *See, e.g., Campbell v. Louisiana*, 523 U.S. 392, 399–400, 118 S.Ct. 1419, 1424, 140 L.Ed.2d 551 (1998) (citing *Singleton*, holding that white criminal defendant may assert equal protection rights of black grand jury members). Accordingly, it would appear that in general, *Singleton* and its progeny give physicians standing to raise their patients' equal protection rights.

However, the plaintiffs in this case have another obstacle to their ability to assert their patients' equal protection rights—they have not pleaded such a claim. Their amended complaint (Dkt.# 3) does not contain an assertion of the patients' equal protection rights. On the contrary, the amended complaint carefully states that the challenged provision violates *"Plaintiffs' patients'* constitutional guarantee of privacy in reproductive decision-making," and violates *"Plaintiffs'* right to equal protection." (Dkt. # 3, page 4) (emphasis added). In enumerating the four claims for relief, the complaint alleges that the regulatory scheme (1) "violates the right of privacy of *Plaintiffs' patients"* as an undue burden; (2) "violates the right of privacy of *Plaintiffs' patients"* in general; (3) "violates the *Plaintiffs' right* to equal protection of the laws"; and (4) "violates the Plaintiffs' due process rights" due to vagueness. (Dkt. # 3, pages 17–18) (emphasis added). Again, on page 5 of their motion for preliminary injunction (Dkt.# 4), the plaintiffs assert that "the regulatory scheme violates their rights to equal protection and the privacy rights of their patients."

Because the plaintiffs have not asserted their patients' equal protection rights in their amended complaint, they can only be asserting their own equal protection rights. Their equal protection claim is therefore subject to rational basis review. *See Reizen*, 743 F.2d at 358.[27]

---

**27.** Even if the plaintiffs had pleaded that they were asserting their patients' equal protection rights, it would not immediately follow that strict scrutiny review would apply. The *Casey* joint opinion held that many of the post-*Roe* decisions applying the strict scrutiny standard to all first-trimester abortion regulations can not be reconciled to "the holding in *Roe* itself that the State has legitimate interests in the health of the woman." *Casey*, 505 U.S. at 871, 112 S.Ct. 2791. The joint opinion noted that the overzealous application of the strict scrutiny standard in the context of the trimester framework "has led to the striking down of some abortion regulations which in no real sense deprived women of the ultimate decision." *Id.* at 875, 112 S.Ct. 2791. The undue burden standard was therefore articulated as "the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at 876, 112 S.Ct. 2791. Given this language, the continued application of the strict scrutiny test in analyzing abortion regulations—even in an equal protection context—might very well conflict with *Casey*. On the other hand, it is not clear that rational basis review should apply in light of *Casey's* decision to reaffirm

### 3. Application of Rational Basis Review

The Court must therefore examine the challenged classification to see if the classification bears "a rational relationship to an independent and legitimate state end." *Romer*, 517 U.S. at 632–33, 116 S.Ct. 1620. "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.* at 632, 116 S.Ct. 1620. However, "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Id.*

The plaintiffs are actually challenging two legislative classifications. The first classification is between physicians who perform abortions in their offices and physicians who perform other, comparable surgical procedures in their offices. The second challenged classification is between physicians who perform fewer than 300 abortions per year and physicians who perform more than 300 abortions per year.

■ The plaintiffs assert that imposing comprehensive regulations on physicians who perform abortions in their offices, while leaving unregulated physicians who perform other, comparable surgical procedures in their offices, violates equal protection. There is ample evidence in the record to support the proposition that there exist other surgical procedures performed in physicians' offices that pose similar or greater risks than abortion. All of the plaintiff physicians testified that they, and most physicians, routinely perform numerous types of invasive surgical procedures in their offices, many of which carry risks equal to, or even higher than, a routine first-trimester abortion procedure. Examples are endometrial biopsy, cervical biopsy, diagnostic hysteroscopy, D & C, conization, tummy-tucks, facelifts, liposuction, endoscopy, and laparoscopy, D & Cs, particularly, involve virtually the same instrumentation, sedation, techniques, duration, and risks as a first-trimester abortion. Yet only abortions subject physicians to regulation. Dr. Lawson, who participated

the *Roe* holding that a woman has a constitutionally protected liberty interest to decide to terminate her pregnancy, and in light of the Supreme Court's continued acknowledgment that a woman's right to choose abortion is one of "certain fundamental rights and liberty interests ... specifically protected by the Due Process Clause." *See Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258.

It may be appropriate, in post-*Casey* equal protection challenges to abortion regulations, to apply some type of intermediate standard of review, as Justice Souter suggests. *See Glucksberg*, 521 U.S. at 767 n. 8, 117 S.Ct. 2258 (Souter, J., concurring) (advocating that "a state law that creates a substantial obstacle for the exercise of a fundamental liberty interest requires a commensurably substantial justification in order to place the legislation within the realm of the reasonable.") (citation omitted). Similarly, Justice O'Connor first articulated the undue burden standard in

1983 as a middle ground between strict scrutiny and rational basis. *See Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 454, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (O'Connor, J., dissenting) (suggesting that if a regulation creates an undue burden, strict scrutiny applies; if no undue burden is created, then rational basis review should apply) Alternatively, a court might hold that *Casey's* requirement that medical regulations be "designed to foster the health of a woman seeking an abortion," and not be "unnecessary," could support the application of an intermediate standard. *See Casey*, 505 U.S. at 878, 112 S.Ct. 2791. However, because the patients' equal protection rights are not currently before the Court, and because the Court finds in this order that the plaintiff physicians' own equal protection rights are violated by the challenged provisions, this issue need not be resolved today.

in the 1997 committee process to draft the 1998 revisions to the abortion regulations, agreed that in some instances, the risks associated with a D & C are the same level as the risks of a vacuum aspiration or suction curettage abortion, and in that context, a woman going into a physician's office for a D & C should have the same regulatory protection as if she were going in for an abortion. Dr. Hendricks, who specializes in infectious diseases and epidemiology, agreed that a first trimester abortion procedure is "quite similar" to a D & C procedure, in terms of both required instruments and level of invasiveness. She testified that the sterilization and infection control procedures she helped draft in the abortion regulations do not address any differences inherent in the abortion procedure, but are equally applicable to all invasive surgical procedures performed in a physician's office.

In light of the above testimony, a rational basis for this classification between office-based abortions and other comparable office-based surgery is not immediately apparent. However, it is important to remember that the overall regulatory scheme in Texas that subjects abortion providers to licensing and regulation—leaving providers of other office-based surgical procedures unregulated—has been in place (in some form) since 1985, and is not being challenged in this lawsuit.[28] The 1999 amendments being challenged by the plaintiffs merely take this existing, unchallenged, regulatory scheme and apply it to additional providers that the legislature apparently believed needed regulation for the same reasons as the other 31 licensed abortion providers in Texas. Given that the regulatory scheme singling out abortion was already in place (and must be presumed to be constitutional),[29] the Court cannot conclude that the legislature has no rational basis to regulate "high-volume" physicians' offices in the same way that abortion clinics are already regulated. Additionally, there is some basis in the record for a legislative belief that health regulations on abortion, as opposed to other procedures, may be justified. The evidence shows that the health department in 1993 investigated the case of a woman who had died from a post-abortion infection. That investigation led to major revisions in the abortion facility regulations, including amendments to include some discharge instructions and follow-up care. The evidence showed that the 1993 death occurred in an abortion facility which had a history of repeatedly failing to properly sterilize its instruments. A health department surveyor with years of experience surveying abortion facilities testified that problems with sterilization were very common in abortion facilities in the early 1990s, particularly those where inadequately trained staff members were performing the sterilization without direct physician supervision or written instructions. Hendricks, the infectious disease physician who has worked at the health department for 10 years, testified that she often gets calls about incidents or outbreaks of infection in various health care areas, but she has never been notified of any particular problems with infection following gynecology surgery or other outpatient surgeries per-

---

28. The plaintiffs have repeatedly asserted that they are challenging only the 1999 amendments, and not the entire regulatory scheme. The one exception is with regard to the due process vagueness challenge to the patient rights provision and the definition of "quality." This exception is not applicable here.

29. "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *Harris County v. CarMax Auto Superstores, Inc.,* 177 F.3d 306, 321 (5th Cir.1999).

formed in physicians' offices. Hendricks was, however, asked to be a witness in a lawsuit where a woman died from a severe infection following an abortion, and she was notified by a hospital about another death following an abortion.

It is not outside the realm of possibility that other office surgical procedures, such as liposuction and facelifts, have resulted in deaths and severe injuries to patients in Texas, but the plaintiffs in this case have not introduced evidence to this effect. The Fifth Circuit has "emphasized that in suits involving a challenge to a law's rational basis, the burden is not upon the state to establish the rationality of its statute, but is upon the challenger to show that the restriction is wholly arbitrary." *CarMax Auto*, 177 F.3d at 322–23. There is also testimony in the record that abortion "is the most frequently performed surgery in the United States," and that more than 80,000 abortions are performed in Texas each year. No specific evidence was presented, however, as to whether other surgical procedures having similar risks to abortion are performed in similar numbers. There was also some discussion in the legislative history of the 1997 committee process that women who suffer complications or infections from abortion might be less likely to report their symptoms or make complaints than patients who suffer complications from other surgical procedures, because of the controversial, secret nature of abortion and the intense emotions that surround the abortion decision. Although there is scant support for this theory in the record, the Court cannot conclude that it is wholly irrational.

In light of the fact that the regulatory scheme singling out abortion providers has been in effect for nearly 15 years and is not being challenged in this lawsuit, and recognizing that the legislature could have reasonably believed that patients receiving abortions in high-volume physician offices are in more need of protection than patients receiving other surgical procedures, the Court must conclude that the classification between physicians who perform abortions in their offices and physicians who perform other, comparable surgical procedures in their offices can be said to bear a rational basis to a legitimate state end. *See Romer*, 517 U.S. at 632, 116 S.Ct. 1620.

■ The second challenged classification—between physicians who perform fewer than 300 abortions per year and physicians who perform more than 300 abortions per year—presents more of a problem. The state advances several "legitimate government interests" that it claims are served by drawing the line at 300 abortions a year. First, the legislative history shows that Senator Harris introduced the provision because he was concerned about a perceived "loophole" in the physician exemption. The intent appears to have been to establish a bright line for the health department to determine which physicians are subject to licensing and regulation. Senator Harris indicated at the Senate committee hearing that, in his review of the list of abortions reported by the state's physicians, he saw physicians who reported performing 1,800 to 2,900 abortions year, yet they had claimed an exemption—apparently evading the intent of the statute—by stating that their offices were not "primarily" used for abortion. Because physicians are not required to report the total number of patients treated, there is currently no immediate way for the health department to verify whether a physician who performed 2,000 abortions actually saw 4,000 patients that year. In contrast, if a numerical threshold for abortions is established, the health department already has the reported abortion statistics and will immediately know which

physicians are subject to licensing and regulation.

The Court recognizes that, in general, creating a bright line for enforcement purposes is a "legitimate state end," and that legislative line-drawing, while often necessary, is always somewhat arbitrary. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 473, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (upholding "arbitrary" provision providing for mandatory retirement of judges at age 70, even though such a classification did not necessarily correspond to a judge's actual loss of mental or physical facilities). However, the evidence in the record shows that the number 300 was not chosen by any rational thought process about increasing risk, but was simply a "raw political compromise." The legislature may have been justified in drawing a bright line to close a loophole, but by choosing the number 300, it drastically overshot the mark. Absolutely no evidence in the record indicates that any of the 12 physicians in the state who provide more than 300 abortions per year (but are currently exempt) ever gave substandard care to an abortion patient or had problems with infections. The state attempts to justify the number 300 by arguing generally that more abortions mean more risk to women. The state contends that as the number of abortions increases, the physician tends to spend less time with each patient and is more likely to delegate tasks to staff members and not be able to adequately supervise activities like sterilization of instruments. Accordingly, as the number of abortions increases, the state asserts, it generally becomes more appropriate to impose safeguards appropriate for abortion clinics, like staff training and qualifications, written sterilization procedures, and regular inspections.

The Court agrees that, as a general proposition, when a physician's office starts to resemble an abortion clinic in the high volume of abortion procedures it provides, it would not be irrational to require that physician to submit to the same regulations as are applied to abortion clinics. However, the question then becomes, what is a "high volume"? The Court concludes that there is no evidence in the record that a physician's office performing 300 abortions a year resembles an abortion clinic. The record shows no rational connection between the number 300 and the "high volume" risks the state claims are associated with abortion clinics. In fact, the evidence amply supports the proposition that the cutoff would have to be significantly higher than 300 to be held rational. Dr. Hansen testified that it might be appropriate to regulate a physician performing 2,000 procedures. Senator Harris, when discussing the perceived loophole, mentioned numbers like 2,900, 2,100 and 1,800. The burdens of the 1999 amendments appear to fall most heavily on Dr. Smith, who performs 350 to 400 abortions a year, and Dr. Hansen, who performs approximately 1,000 abortions a year, but appear to pose less of a problem for Dr. Kaminsky, whose office provides about 1,500 abortions a year, and Dr. Robinson, whose office provides 2,211 abortions a year. There was testimony that abortion clinics might provide abortions to 15 to 35 women each working day, which would average out to a range of approximately 3,700 to 8,700 abortions per year. Dr. Robinson testified that the licensed clinic where he works on a part-time basis performs 3,600· to 3,700 abortions per year.

These figures show that it is not rational to assume that a physician providing 300 abortions per year will expose his patients to "high volume" risks similar to those of a typical abortion clinic. The evidence shows that Senator Harris originally suggested the number 10, and later negotiated the number 300 with pro-choice activists as

a political compromise. The only rationale articulated for the number 300 in the official legislative history was to regulate a physician who performs more than one abortion per working day. This "one a day" rationale cannot be reconciled with the state's argument that some physicians may be providing so many abortions that they are unable to adequately take care of patients. It is irrational to assume that one abortion per day is a heavy workload, considering that a clinic might provide up to 35 abortions per day. The evidence shows that a physician might see and provide medical services to 20 patients overall during a typical day. Performing one abortion per day, then, would only constitute 5 percent of that physician's practice. It cannot be rational to conclude that a physician performing an average of one abortion a day as part of a general gynecological practice is thereby subjecting his patients to the "high volume" risks cited by the state. The Court must conclude that "the facts on which the classification is based could not reasonably be conceived to be true by the decisionmaker" *See Gregory*, 501 U.S. at 473, 111 S.Ct. 2395 (quotation marks and ellipses omitted).

Indeed, the rationale that more abortions equals more risk is already tenuous; the evidence showed that any increased risk from physician inattentiveness, a heavy schedule, and more delegation to staff is not directly related only to the number of abortions performed, but may also depend upon the size of the physician's staff, the hours the office is open, and the number of total patients seen and total procedures performed of all types. The defendants' witness, Dr. Long, testified that sterilization issues do not change depending on the number of procedures a physician performs. "Sterilization doesn't have anything to do with numbers," Long testified. Long said that she could think of no medical, safety, or health reason to draw the regulatory line at 300 abortions.

■ The Court recognizes that "[a] State does not violate the Equal Protection Clause merely because the classifications made by its law are imperfect." *Arceneaux v. Treen*, 671 F.2d 128, 134 (5th Cir.1982). However, this is not a case where the classification is merely "imperfect" or "not made with mathematical nicety." *Id.* In this case, the legislature's choice of the number 300 as the point where risks start to increase is not just slightly inaccurate or arbitrary—it is not even remotely close to the numbers with which the "high volume" risks seem to be associated. All of the evidence in the record points to a much higher number. Although legislatures have the power to draw lines, the line drawn in this case "is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the [legislature's] actions were irrational." *See Gregory*, 501 U.S. at 471, 111 S.Ct. 2395; *see also Greenville*, 66 F.Supp.2d at 741 (holding, *inter alia*, that regulations on physicians who performed five or more abortions a month, but not on those who performed fewer abortions, violated equal protection even under rational basis review).[30]

---

**30.** To draw an analogy, it was not irrational for Missouri to draw the mandatory retirement line at age 70, based on the rationale that "physical and mental capacity sometimes diminish with age." *Gregory*, 501 U.S. at 472, 111 S.Ct. 2395. However, the classification could not have been found rational if Missouri had drawn the mandatory retirement line at age 25, using the same rationale. If the required respect for legislative line-drawing means that a court cannot ever question the rationality of the relationship between the chosen classification and the stated purpose, then rational review is meaningless. Such a result would be incompatible with the Supreme Court's statement in *Romer* that "we

Accordingly, the Court must conclude that the classification drawing the line between physicians who perform fewer than 300 abortions per year and physicians who perform more than 300 abortions per year does not bear a rational relationship to a legitimate state end, and therefore violates the physicians' right to equal protection under the law. The Court concludes that the plaintiffs have shown a substantial likelihood that they will succeed on the merits of their equal protection claim.

## D. Vagueness Claim

■ Although they assert generally that they are attacking only the 1999 amendments and not the regulatory scheme in general, the plaintiffs assert that three provisions of the abortion regulations are unconstitutionally vague. Section 139.51(1) requires a physician licensed as an abortion provider to "ensure that all patients . . . are cared for in a manner and in an environment that enhances each patient's dignity and respect in full recognition of her individuality," and Section 139.51(2) requires the physician to ensure that all patients "receive care in a manner that maintains and enhances her self-esteem and self-worth." "Quality" is defined subjectively in the regulations as "the degree to which care meets or exceeds the expectations set by the patient." 25 TAC § 139.2(43). These regulations are already applicable to licensed abortion facilities, but the 1999 amendments will apply them for the first time to the plaintiffs.

■ Due process prohibits laws so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application. *See Okpalobi,* 190 F.3d at 357. Vague laws offend due process in two respects. First, they fail to provide the persons targeted by the statutes with a reasonable opportunity to know what conduct is prohibited so that they may act accordingly. *Id.* Second, by failing to provide explicit standards for those who apply them, vague laws impermissibly delegate basic policy matters to the government representatives charged with enforcing the law, with the attendant dangers of arbitrary and discriminatory application. *Id.* The imposition of criminal penalties requires a statute to provide an even higher level of certainty. *Id.* at 358 n. 10. "A vague law is especially problematic, and the standard of a court's review is therefore more stringent" when the uncertainty induced by the statute "threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 358.

The testimony in the record indicates that there is no objective way to measure compliance with the provision that requires physicians to "enhance" each patient's dignity and self-esteem. Jeffers, the health department representative who helped draft the provision, agreed that people might have different interpretations of that language, and that a health department surveyor might have a different interpretation than a physician regarding whether the physician was in compliance. Jeffers acknowledged that it would be up to the surveyor's discretion and interpretation as to whether the physician would be subjected to civil or criminal penalties for not doing enough to "enhance . . . self esteem."

In addition, several of the plaintiffs testified that although they certainly strive to treat all patients with dignity and respect, they are concerned about health department surveyors who can fine them or suspend their licenses, subjecting them to

insist on knowing the relation between the classification adopted and the object to be attained." *Romer,* 517 U.S. at 632, 116 S.Ct. 1620.

criminal charges, if the surveyors conclude that this vague standard has not been satisfied. Abortion is a traumatic and difficult life decision under any circumstances, so it appears unrealistic to require physicians, under the threat of discretionary civil and criminal penalties, to "enhance" dignity and self esteem in connection with an event that is virtually always a negative experience despite a physician's best efforts to provide emotional support

"The Supreme Court has invalidated laws that alter the standard of care a physician owes an abortion patient on vagueness grounds because of the potential for chilling the providing of services." *Okpalobi*, 190 F.3d at 358 (citing *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)). In *Colautti*, the Supreme Court held impermissibly vague a Pennsylvania abortion statute requiring a physician to adopt a particular standard of care whenever the physician determined that a fetus was viable or "may be viable." *Colautti*, 439 U.S. at 391–94, 99 S.Ct. 675. Because the law provided no guidance as to the meaning of the term "may be viable," it conditioned potential liability on "confusing and ambiguous criteria," and was therefore void for vagueness. *Id.* at 394, 99 S.Ct. 675. In *Okpalobi*, the Fifth Circuit held that a Louisiana "informed consent" provision was impermissibly vague because "it is impossible to tell what conduct will incur liability under the Act." *Okpalobi*, 190 F.3d at 359.

Similarly, defining "quality" in terms of the "expectations set by the patient" is vague because the required standard of care would change from patient to patient. "I do not see how it is possible to have a functional quality assurance program that is based on the expectations of the patient," Hansen testified, "and I would be at a loss as to how I could implement such a program." Davis testified that it "would not be possible to determine each patient's expectations or whether the care she received meet or exceeded those expectations. Nor is it clear how the quality assurance committee can function in response to the different expectations of each patient."

For these reasons, the Court concludes that 25 TAC Sections 139.51(1) and 139.51(2), as well as Section 139.2(43), are unconstitutionally vague, and that therefore the plaintiffs have established a substantial likelihood of success on their vagueness challenge to these provisions.

**E. Additional Requirements for a Preliminary Injunction**

If the 1999 amendments are enforced, the plaintiffs will face immediate risk of criminal charges as of January 1, 2000 if they continue their current practices without becoming licensed, under a provision that has been held to violate equal protection. In addition, enforcement of the vague provisions will infringe the plaintiffs' constitutional right to due process. Therefore, the Court finds a substantial threat that the plaintiffs will suffer irreparable injury absent an injunction. *See Okpalobi v. Foster*, 981 F.Supp. 977, 987 (E.D.La.1998) (holding that when a constitutional right is impaired, no further showing of irreparable injury is necessary), *aff'd*, 190 F.3d 337 (5th Cir.1999).

Furthermore, the Court finds that the threatened injury to the plaintiffs outweighs any harm that might result from an injunction. Enjoining the effect of the 1999 amendments will only preserve the status quo until a full trial on the merits can be had. Nothing in the record suggests that any harm will result from allowing the 12 physicians to whom the amendments apply to continue to provide abortions (as they have done for years) without obtaining an abortion facility li-

cense during the pendency of this case. The risks the state was seeking to address with the 1999 amendments are general, not specific to the five plaintiff physicians, or even to the other seven physicians affected by the amendments. Absolutely no evidence in the record indicates that any of the 12 physicians in the state who provide more than 300 abortions per year (but are currently exempt) have ever given substandard care to an abortion patient or had problems with infections.

In addition, there is evidence that two of the plaintiffs will cease performing abortions (and in Dr. Smith's case, completely close down her private practice) on January 1, 2000 if the 1999 amendments are not enjoined. The Court concludes that the injury that will accrue to physicians who will have to choose whether to immediately close down all (or a significant portion) of their practices, or to seek licensing under a law that this Court has found to be unconstitutional, is greater than the unlikely risk that any women will be harmed by the state's inability to apply the abortion facility licensing scheme to 12 physicians pending trial on the merits. See, e.g., Women's Medical Professional Corp. v. Voinovich, 911 F.Supp. 1051, 1092 (S.D.Ohio 1995) (enjoining abortion regulation; holding that "[a]s far as the Defendants' interests are concerned, a preliminary injunction will merely maintain the status quo while the constitutionality of this legislation is decided.")

Finally, the Court concludes that a preliminary injunction will not disserve the public interest. See Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 280 (5th Cir.1996) (holding that enjoining the enforcement of an unconstitutional provision does not disserve the public interest). The public does not have an interest in enforcing an unconstitutional law. Id. at 280. Additionally, there is evidence in the rec-

ord that if Dr. Smith and Dr. Hansen cease their private abortion practices, Dr. Smith's abortion patients (the majority of whom are college students with few resources) will face the prospect of having to find transportation to a Dallas abortion clinic 45 to 90 minutes away, and Dr. Hansen's "medically indicated" abortion patients will be subjected to the less personal atmosphere of abortion clinics. The Court has held that such hardships do not, on this record, rise to the level of an undue burden under Casey. However, the potential effect on Smith's and Hansen's patients finds enough support in the evidence to constitute evidence that a preliminary injunction will not disserve the public interest.

Accordingly, the defendants will be enjoined from enforcing the 1999 amendments to the Texas abortion regulatory scheme, pending a full review of this case on the merits.

## VI. Conclusion

For the reasons set out in this order, the plaintiffs' motion for preliminary injunction (Dkt.# 4) is GRANTED with regard to the claims that the 1999 amendments violate the plaintiffs' equal protection rights; is GRANTED with regard to the three provisions found to be unconstitutionally vague; but is DENIED with regard to the claims that the 1999 amendments violate the plaintiffs' patients' due process rights. Therefore, it is ORDERED that Texas Commissioner of Health William R. Archer, III, and Texas Attorney General John Cornyn, in their official capacities, are hereby enjoined from enforcing the 1999 amendments to Texas's abortion licensing statute and regulations, and 25 TAC Sections 139.51(1), 139.51(2), and 139.2(43), pending a full trial on the merits.